**GORDY TIRE COMPANY**

v.

**UNITED STATES.**

No. 172–59.

United States Court of Claims.

Dec. 6, 1961.

Randolph W. Thrower, Atlanta, Ga., for plaintiff. Michael J. Egan, Jr., and Sutherland, Asbill & Brennan, Atlanta, Ga., were on the briefs.

Earl L. Huntington, with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. James P. Garland and Philip R. Miller, Washington, D. C., were on the brief.

WHITAKER, Judge.

The question presented in this case is, whether or not the Commissioner of Internal Revenue was justified in disallowing as a deduction the salaries paid plaintiff's president and secretary-treasurer, and deducted by plaintiff in computing its Federal income taxes for the years 1954 and 1955, and allowing, instead, a salary for plaintiff's president of considerably less than one-half of the salary paid, and a lesser amount than that paid for plaintiff's secretary-treasurer.

For five of the last six years plaintiff had paid its president a salary of $18,000 per year, and, at the end of the year, a bonus of $32,000, including the year 1954, one of the tax years involved. In 1955, another year involved, it gave him a bonus of $22,000. The total paid him was $50,000, except for 1955, when it was $40,000.

The secretary-treasurer was paid a salary of $4,800 for each of the years in issue and, in addition, a bonus for 1954 of $1,000, and for 1955, of $2,000.

The Commissioner of Internal Revenue allowed a deduction of only $18,000 for plaintiff's president, and $4,800 for the secretary-treasurer.

We concur in the action of the Commissioner of Internal Revenue with respect to the salary of plaintiff's secretary-treasurer, but not with respect to that paid its president.

In view of all the circumstances in this particular case, we do not think the Commissioner of Internal Revenue was justified in disallowing the salary plaintiff paid its president for either of the two years 1954 and 1955.

 The law allows a taxpayer to deduct a "reasonable allowance for salaries or other compensation for services actually rendered." The Commissioner of Internal Revenue was required to allow what plaintiff had deducted unless it was clear that the salaries were unreasonable. In the ordinary business the people connected with it are in the best position of anyone to know what salary was reasonable and what was not; and the Commissioner of Internal Revenue is not justified in setting aside their judgment unless he is convinced it is without foundation.

 Too often revenue agents do not credit a taxpayer with a purpose to deal justly with the government. No one likes to pay taxes and no one means to pay more than he justly owes, but we are among those who believe that the great majority of our citizens pay what they think they are due to pay. We think the American people as a whole are honest and decent. We indulge the presumption that they are. So, we indulge the presumption that the salaries paid by plaintiff were reasonable, even though the official to whom the salary was paid and his wife owned all of plaintiff's stock.

This record reveals Mr. Gordy, plaintiff's president, as quite a remarkable

man, trusted by those who knew him; there is not one thing that reflects on his integrity. He has said that he thinks the salary paid him was fair, and he is in the best position of anyone to know what was fair. Even in the case of a wholly-owned corporation, the Commissioner of Internal Revenue is not justified in setting aside the salaries paid unless he is convinced they are unreasonable.

The salary the Commissioner of Internal Revenue allowed in this case is far more unreasonable than the salaries paid and deducted. He allowed $18,000 to the president of a company that over the last five years had done a business of from $3,000,000+ to $4,000,000+, and that had realized net profits before taxes, *after deduction of the salaries claimed*, of $230,000+, $49,000+, $37,000+, $46,000+, and $77,000+.

After deduction of the $50,000 salary in 1954 and the $40,000 in 1955, and after taxes, this company had net earnings of $24,907 in 1954, and $40,171 in 1955. This was a return on its invested capital of 5.8% in 1954, and 8.8% in 1955. This compares favorably with the average rate of return of 125 retail tire companies in the United States, which was around 5%.

The $18,000 salary allowed plaintiff's president was $6,000 less than the commissions earned by plaintiff's leading salesman. And, yet, the success of the business was almost wholly due to Mr. Gordy's foresightedness and business acumen. The excellent opinion of the trial commissioner of this court tells in succinct fashion the remarkable story of this man's success against great odds, of the growth of this business from nothing in 1932 to a $4,000,000 business in 1955, with accumulated net earnings over these years of nearly $400,000. We quote the following from pages 8 to 10 of the trial commissioner's opinion:

"The business of the plaintiff had its beginning in 1932, when Mr. Gordy, who was then about 24 years old and without capital of his own, leased a filling station site in Atlanta and began to operate the filling station with the assistance of one employee. A few tires were sold from this site on a retail basis. By 1941, Mr. Gordy had moved to larger quarters, had further expanded his facilities by renting nearby storage spaces, had increased his retail tire business, and had entered the wholesale tire field on an extensive scale.

"In the early days of World War II, Mr. Gordy was advised by his suppliers that he should get out of the tire business, because the suppliers believed that an independent dealer would not be able to survive in view of the wartime shortage of tires. Contrary to this advice, Mr. Gordy moved again to still larger quarters, and he added tire recapping operations to his business. While others in the tire industry were cutting down, he maintained and enlarged his sales staff by hiring salesmen who were being discharged by tire manufacturers and by other tire distributors. It was not necessary to have a sales force in order to sell tires during the war, but Mr. Gordy was looking ahead. These decisions by Mr. Gordy proved to be highly advantageous in the years following the war, putting him well ahead of his competition.

"The plaintiff was incorporated on June 1, 1946, with Mr. Gordy as president and directing head of the corporation.

"In October 1952, the plaintiff moved from downtown Atlanta into a very large building which Mr. Gordy had constructed for the plaintiff at a location that was then within a residential area on the outskirts of Atlanta. The plaintiff's suppliers endeavored to discourage Mr. Gordy in connection with the projected move of the plaintiff from downtown Atlanta to what was then a noncommercial area that appeared to be out in the country. However, the location was near the site of a proposed expressway that was soon to be built, and Mr. Gordy believed that it was

potentially a valuable location for a business enterprise. With the building of the expressway and the subsequent development that occurred in the area of the plaintiff's new building, that location turned out to be a very valuable one for the plaintiff's operations, and it gave the plaintiff a decided advantage over its competitors.

"Throughout the history of the plaintiff and its predecessor enterprise, with the exception of a year around 1948 or 1949, there has been a steady growth under the leadership of Mr. Gordy. The plaintiff has gained a nationwide reputation as being a very aggressive and far-sighted company and one of the leaders in the tire distribution industry. In size, the plaintiff has become one of the largest, if not the largest, among the independent tire dealers in the country.

"Mr. Gordy's management has been largely responsible for the plaintiff's growth and for its high standing in the tire distribution field. This is a highly competitive business, in which there are many failures. In his capacity as president and directing head of the plaintiff, Mr. Gordy has been a competent, aggressive operator, and he has established a reputation as a man of character and integrity. It is this reputation which enabled the plaintiff to obtain the credit that was necessary for its virtually constant program of expansion."

It must be said that the trial commissioner concluded, notwithstanding the foregoing, that a salary of $35,000 was in his opinion a reasonable one.

■■■ A salary of $18,000 a year for such a man is absurd. Such a finding of the Commissioner of Internal Revenue is not presumptively correct, and we must consider the matter independently of it.

Can we say that $40,000 and $50,000 are unreasonable? It would not seem to be when there was left a considerably higher return on invested capital than the average company earned, as we set out above. Every year for the last six years the plaintiff had paid Gordy a bonus of $32,000, in addition to his salary of $18,000, except in 1955, when it was $22,000, and, yet during those years the company's accumulative earnings had increased from $114,000+ to $393,000+.

The president of the Trust Company of Georgia testified that if he were appointed receiver of this tire company, with instructions to operate it, he would be glad to get such a man as Gordy to manage it at a salary of $50,000. The Manager of Credits and Collections of the United States Rubber Company, and the Sales Manager, Gillette Tire Division of the United States Rubber Company, testified the salary paid Mr. Gordy was in line with that paid by comparable companies. These men were friendly witnesses, but we must credit their testimony unless we believe they were speaking falsely. We have no reason to think so. Cross-examination did not discredit them. Even people with an interest in the nature of their testimony are expected to tell the truth, and must be presumed to have done so, unless the contrary appears.

Defendant offered no contrary testimony.

We are by no means convinced the president's salary was unreasonable. If not, the Commissioner of Internal Revenue should have allowed it to stand. Certainly what he did was wholly unreasonable, and, being unreasonable, it is not presumed to be correct. Since there is no presumption in favor of the action of the Commissioner of Internal Revenue, or, rather, since this presumption has been clearly rebutted, we should not disturb what the taxpayer himself has done, unless we ourselves think it unreasonable. We do not think it is.

Judgment will be entered in plaintiff's favor, with the amount to be computed under Rule 38(c), Rules of Court of Claims, 28 U.S.C.A.

It is so ordered.

DARR, Senior District Judge, sitting by designation, and DURFEE and LARAMORE, Judges, concur.

JONES, Chief Judge (dissenting).

I would approve the findings and conclusion of the trial commissioner who heard the evidence.

The law is clear. The single issue is what was a reasonable salary for the president of the company during the period in question. This is largely a factual question.

I admire and pay tribute to any American who can build a succeessful business in a highly competitive field. He earns and should receive substantial compensation.

But after all the plaintiff has a local business. There are tens of thousands of successful businessmen in hundreds of lines of activity in this broad, big country. That is the glory of this land and the anchor of our safety.

Here we are setting aside the judgment of the trial officer who saw the witnesses face to face, and substituting the judgment of men who, however able they may be, have not had the privilege of listening to any of the witnesses. It is exceedingly difficult for a judicial officer to look at the cold record and accurately determine the credibility of witnesses. It is far easier for one who sees the demeanor of witnesses and who studies the record with great care to correctly gauge and properly measure the facts in issue.

The majority opinion quotes certain parts of the trial commissioner's opinion, largely those parts that are favorable to the conclusion which the majority has reached. However, when the entire opinion is read a different picture is presented.

We quote further from the trial commissioner's opinion as follows:

"In connection with the weight to be given to the opinion testimony offered by the plaintiff in the present case, it is pertinent to observe that the witnesses who gave such testimony were, in addition to Mr. Gordy, Mrs. Gordy, and the plaintiff's auditor, officials of organizations which had long maintained, and were still maintaining, business relationships —presumably of a profitable nature —with the plaintiff. [Tr. Comm. Op. p. 4.]

"It is also pertinent to inquire in this type of case whether the purported compensation to the owners of a corporation was fixed in advance or retroactively, after the financial situation of the corporation for a particular year had been determined. If the facts show that an amount purportedly representing compensation was fixed at the close of a year, when earnings could be ascertained, the retroactive action tends to characterize such an amount as a dividend rather than as compensation. [Tr. Comm. Op. p. 6.]

"A further point considered by the courts is whether the purported compensation had a reasonable relationship to the corporation's gross profit and net profit on sales. Mayson Mfg. Co. v. Commissioner, supra [6 Cir., 178 F.2d 115], at p. 119; Patton v. Commissioner, supra [6 Cir., 168 F.2d 28], at p. 31. In connection with this standard, the evidence in the record indicates that companies engaged in the tire distribution business paid their executives, on the average, approximately 9.4 percent of gross profits on sales for the years 1954 and 1955, and that such companies still made an average net profit of about 3 percent on sales. The plaintiff's payments to its executives for the fiscal year 1954 represented 8.14 percent of the plaintiff's gross profit on sales, and the plaintiff's payments to its executives for the fiscal year 1955 represented 6.37 percent of the gross profit on sales, so that the plaintiff's payments to its executives were well within one phase of the standard now under consideration. On the other hand, the plaintiff in 1954 had a net profit on sales of only 0.8 percent, and in 1955

its net profit on sales was only 1 percent. [Tr. Comm.Op. pp. 7–8.]"

When the entire opinion is read and the transcript is reviewed, it becomes manifest that the salary paid to Mr. Gordy for the last 4 years, including 1954 and 1955, amounted to more than the average net income remaining during those 4 years after deducting the salaries claimed. It is also undisputed that the bonuses paid were larger than the remaining part of the salary and the only witness on the subject testified that the bonus was not arranged for in advance but was declared at the end of the year; thus it apparently partook more of the quality of a dividend than of a salary. As a dividend it, of course, would not be deductible as a business expense.

It is also apparent that all of the witnesses who testified as to the reasonableness in salary had a financial relationship or dealings with plaintiff, including the banker who had solicited and obtained his business from a competing bank, the manager of a rubber company which sold him $250,000 worth of rubber per year and others who had a business relationship with him. This does not reflect on them, but in measuring the weight of testimony the courts always take such facts into consideration.

No one in so far as we are able to glean from the record has reflected upon the integrity of Mr. Gordy. He was a successful businessman. As indicated in the majority opinion, his business had grown from practically nothing in 1932 to an accumulation of some $400,000. But this is the story of thousands of men and concerns who started near the end of the greatest depression in our history and built their organizations into successful concerns, some of them much more rapidly and extensively than the Gordy Tire Company.

There is no blame whatever attached to any income taxpayer who reduces his taxes in every practical way, but the deductions should bear some relationship to salaries in similar lines of activity and should bear some relation to the earnings of the company during the period involved. In 1954 the plaintiff company had a net profit of only 0.8 percent and in 1955 a net profit of only 1 percent. This is below the national average of people engaged in the tire business during those 2 years.

Then, too, a decision of this kind adds materially to the problems of those enforcement officers who are clothed with responsibility of setting a pattern. These problems are already difficult. For us as a court sitting in chambers to raise the finding of an experienced trial commissioner 50 percent and to almost triple the finding of the Commissioner of Internal Revenue as to what is reasonable compensation, in the words of the operator of the old-time traction engine, is to apply enough steam pressure to "bulge the crown sheet."

Conceding that the Commissioner of Internal Revenue may have used too much of a general pattern; that he may not have made sufficient allowance for the unusual accomplishments of the plaintiff's president and thus to some degree may have in a legal sense abused his discretion, we should be careful not to abuse it at the other extreme. If we are to allow $50,000 as a deduction for one officer who was head of a concern which occupies one field of commercial activity in a single city, what should be allowed as deduction for a salary to an official of business concerns that operate on a nationwide scale and especially when they cover multiple fields?

The trial commissioner has nearly doubled the salary allowance made by the Commissioner by raising it to $35,000 per year. In the light of this record that seems adequate—even generous. But in deference to the judgment of the trial officer, who perhaps more than anyone else has studied the background of this case, I would approve his finding. But to raise that another 50 percent is, it seems to me, indefensible. The record is silent as to whether any other businessman in Atlanta received a salary of $50,000 per annum.

I would adopt the trial commissioner's findings of fact and opinion.