**BRINGWALD, INC.**

**v.**

**The UNITED STATES.**

**No. 136-61.**

United States Court of Claims.
July 17, 1964.
Rehearing Denied Oct. 16, 1964.

John E. McClure, Washington, D. C., for plaintiff. John P. McClure, Washington, D. C., was on the brief.

Robert Livingston, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, Philip R. Miller, and Earl L. Huntington, Washington, D. C., were on the brief.

Before JONES, Senior Judge, WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Senior Judge.[1]

This is an action to recover $15,729.58 as alleged overpayment of Federal income tax and interest for the years 1953–1955. The principal issue in this case concerns the reasonableness of salaries paid a husband and wife who were the officers and virtually sole stockholders of the corporate taxpayer.

The taxpayer is a small truck-leasing company in Terre Haute, Indiana. At all times material here, it had one class of stock of which 254 of the 256 outstanding shares were owned by Leo and Mildred Bringwald, husband and wife. The other two shares were owned by Leo's parents. Leo was the president and general manager of the taxpayer and Mildred was its secretary-treasurer.

In its tax returns for the fiscal years ending September 30, 1953–1955, the taxpayer deducted as salaries $21,000, $29,000, and $26,000, respectively to Leo,[2] and $2,700 each year to Mildred. The Commissioner of Internal Revenue determined that the amounts claimed were unreasonable, and that $12,000 per year for Leo and $600 per year for Mildred were allowable for tax purposes. The taxpayer paid the resulting deficiencies and filed its claims for refund. After the claims for refund were disallowed by the Commissioner, the taxpayer timely instituted the present action.

---

1. At the request of the court, Trial Commissioner C. Murray Bernhardt prepared an opinion which has been of very material assistance.

2. These figures are partly the result of the unequal amounts paid to Leo throughout the calendar year. Leo was allegedly paid on the basis of $24,000 per calendar year but the taxpayer was on a fiscal year basis for tax purposes. It appears from the record that substantial payments were made to Leo by the taxpayer on the last day of the fiscal years in issue, viz., $9,000, $14,000, and $6,000, respectively. [Tr. 99–100]. The record [Tr. 65] also indicates the following on cross-examination of Leo Bringwald:

"The Commissioner: Were you paid the same amount each month, Mr. Bringwald?

"The Witness: I never received a regular salary. It was merely set up in the books quarterly and if the corporation could pay it, I took it, and if it couldn't, I wouldn't. But in no case did I leave it ride over two and a half months after it was due."

It is interesting to note that the last sentence of the above-quoted testimony is contradicted by the claimed deductions of $29,000 for 1954 and $26,000 for 1955. These amounts exceeded the $24,000 figure by a total of $7,000. During oral argument counsel for the taxpayer stated that the excess was due to unpaid salary carried over from prior years. Thus at the end of fiscal year 1953 the taxpayer appears to have owed Leo at least the equivalent of three and one-half months' salary.

Leo is the son of Will Bringwald, who owned the Bringwald Transfer, Inc., a certified truck-line carrier with its principal offices in Vincennes, Indiana. In 1938, the Weston Paper & Manufacturing Company of Terre Haute engaged Bringwald Transfer, Inc., to haul a few loads of paper between its plants in Terre Haute and St. Marys, Ohio. At the urging of his father, Leo purchased a truck and trailer and in late 1938 moved to Terre Haute with the idea of capitalizing on the business of Weston Paper. Leo operated as a sole proprietorship in Terre Haute until 1946 when the taxpayer was incorporated.

Approximately 98 percent of the taxpayer's business was obtained from hauling paper for customers of Weston Paper and its subsidiary, the Wabash Fibre Box Company of Terre Haute. Weston Paper actually paid for these services and billed its consignees on a freight prepaid basis, but Leo generated the business by persuading Weston Paper's customers to request shipping by truck instead of rail. Although Weston Paper paid the freight charges, it respected the wishes of its customers for business reasons.

Leo and Mildred Bringwald's home was located adjacent to the garages and parking area for taxpayer's trucks. The taxpayer had no office as such in Terre Haute. There was a desk in the living room of the house and a file cabinet in the children's room.

An undetermined part of Mildred's time was devoted to personal services for the taxpayer. However, her primary occupation was that of a housewife and mother. During the years in issue, she served as secretary-treasurer and a director of the taxpayer. Other than being a director, she answered the telephone in the house, helped in processing bills of lading and bills from creditors, and checked monthly statements against invoices and other charges. There was a telephone extension in the garage where Leo spent a fair amount of his time when not in the house. It was the practice that Mildred would let the phone ring a few times to see if Leo or one of the men would answer it in the garage. If no one answered the phone on the garage extension, Mildred would answer it and take any message.

For the years in issue, the operations of the taxpayer can be summarized by the following table:

| Year | Gross sales | Net income before taxes [1] | Net income after taxes [1] | Total invested capital as of the beginning of the year | Rate of return [1] |
|------|------|------|------|------|------|
| | | | | | *Percent* |
| 1953 .............. | $175,611 | $1,568 | $835 | $99,532 | 0.84 |
| 1954 .............. | 203,068 | 1,664 | 382 | 100,367 | 0.38 |
| 1955 .............. | 224,839 | 8,731 | 5,966 | 100,749 | 5.92 |

[1] These figures do not include the adjustments occasioned by the Commissioner's determination.

No dividends have ever been formally paid by the taxpayer.

After dealing with Weston Paper for a while, Leo recognized the need for a trucking company in St. Marys, Ohio, in order to render better service to Weston. He therefore organized a new company, the St. Marys Trucking Company, for this purpose. The principal customer of this new company has also been Weston Paper. A Mr. Braunschweiger was hired as president of St. Marys Trucking Company. Braunschweiger acted both as president and general manager of the

new company and Leo's supervision was primarily done by telephone. Braunschweiger's compensation was $6,148.79 in 1953, $8,149.15 in 1954, and $10,000 in 1955. Leo received no salary from the St. Marys Trucking Company, although he performed services for it. The operations of the St. Marys Trucking Company, for the years 1953–1955, can be summarized by the table below:

| Year | Gross sales | Net income before taxes | Net income after taxes | Total invested capital as of the beginning of the year | Rate of return |
|------|------------|------------------------|------------------------|--------------------------------------------------------|----------------|
| | | | | | *Percent* |
| 1953 .............. | $87,530 | $1,849 | $1,168 | $45,841 | 2.55 |
| 1954 .............. | 95,143 | 6,342 | 4,440 | 47,009 | 9.45 |
| 1955 .............. | 147,054 | 12,660 | 8,862 | 51,449 | 17.23 |

There is also in the record evidence as to amounts paid to the general managers of two other Terre Haute trucking companies, both of which were substantially larger companies than the taxpayer. In one, the Merchants Freight System, Inc., a Mr. Maloney was hired as the general manager in 1960 and he received $9,204 as compensation in 1961. In the other company, Motor Freight Corporation, the general manager was also an officer and a director and had been with the company since 1940. Its substantial growth was largely attributable to his efforts. Its net income during 1953–1955 was substantial; the rate of return on invested capital ranged from 19–33 percent per year before Federal income taxes. Neither of the above individuals owned stock in their respective companies. The latter individual received as total compensation $18,655, $19,431, and $21,653, for the years 1953–1955, respectively; from one-third to two-thirds of these amounts were in the form of a bonus which was dependent upon the amount of net income of the company.

Our trial commissioner, after hearing the evidence, concluded that there was no true comparison between the services rendered to the taxpayer by Leo Bringwald and those rendered by the general managers of the two other trucking companies in Terre Haute. It was his opinion that Leo Bringwald's "complete devotion to the plaintiff company from its inception many years before, his success and ingenuity in promoting the business from an idea to a prosperous reality over a period of 15 years, do not seem to make an annual salary of $24,000 unrealistically disproportionate to his worth to the company." The same was said of Mrs. Bringwald's salary of $2,700 during each of the three taxable years in issue.

The Government's position is that the taxpayer has not overcome the presumption of correctness in favor of the determinations of the Commissioner of Internal Revenue. The Government points to the low rate of return on invested capital and the fact that the taxpayer has never paid a formal dividend in its history and contends that these facts support an inference that the disputed payments, in part, constituted a distribution of profits because of ownership of the taxpayer rather than compensation for personal services rendered. Furthermore, the Government contends the comparative evidence introduced supports the determinations of the Commissioner of Internal Revenue as being reasonable.

The taxpayer appears to be contending that since the trial commissioner has found for the taxpayer, the sole question now before the court is whether those findings are clearly erroneous. The taxpayer's "ultimate argument" appears to

be that the trial commissioner's findings are supported by the facts in the record and, furthermore, the disputed salaries paid to Leo and Mildred Bringwald did not exceed their salaries in prior years and so should be allowed.

■ We will first consider the taxpayer's contention that the question before us now is whether the findings of our trial commissioner are clearly erroneous, rather than whether the taxpayer had sustained its burden of proof that the determination of the Commissioner of Internal Revenue was wrong. We quote the pertinent part of our Rule 66 (1964 edition):

"In all actions tried on the facts, the court will find the facts and state separately its conclusions of law, and will direct the entry of an appropriate judgment. The court may adopt the commissioner's report, including conclusions of fact and law, or may modify it, or reject it in whole or in part * * *."

While the findings and opinion of a trial commissioner are entitled to much consideration and weight, yet under our rules and procedure the court has the ultimate responsibility for determining these matters.

Section 23(a) (1) (A) of the Internal Revenue Code of 1939 allows as deductions, in computing net income, "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *." Section 162(a) of the 1954 Code, applicable for taxpayer's fiscal years ending September 30, 1954 and 1955, is substantially to the same effect. Treasury Regulations promulgated under the Codes provide that the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Treasury Regulations 118 (1939 Code), § 39.23(a)–6; Treasury Regulations (1954 Code), § 1.162–7.

■ The question of the reasonableness of a salary paid to an employee is a question of fact which must be determined by reference to all of the facts in a particular case. Thus, we have said in Irby Construction Co. v. United States, 290 F.2d 824, 826, 154 Ct.Cl. 342, 346 (1961):

"There is no definite formula by which the question of the reasonableness of compensation in any particular instance can be determined. It is a question of fact which must be resolved anew in each case. Stiening v. Commissioner, 3 Cir., 1945, 147 F.2d 204. Yet no one fact can be considered controlling to the exclusion of all others. Ticket Office Equipment Co. v. Commissioner, 1953, 20 T.C. 272, affirmed, 2 Cir., 1954, 213 F.2d 318. Each situation must be examined as a whole. The issue most often arises, as it does here, in a case concerning a close corporation, where the employees are also stockholders or members of a family controlling the corporation. It is readily apparent that in this situation the question of reasonableness of compensation is inseparably tied to the question of whether the alleged compensation is not really a dividend in disguise."

Among the guides considered by courts in determining the reasonableness of compensation, mentioned in the Irby decision, are "the amounts paid by similar enterprises for services of a like character; the type and extent of services rendered by the employee."

■■ In the present case the Bringwalds' compensation could not be said to be the result of an arm's-length bargaining since they were virtually the sole stockholders and so were under no restraint of adverse interest. Baltimore Steam Packet Co. v. United States, 180 F.Supp. 347, 148 Ct.Cl. 699, 703 (1960); Gem Jewelry Co. v. Commissioner, 165 F.2d 991 (5th Cir. 1948). Therefore, it is proper to subject their compensation to close scrutiny to insure that it

was not fixed to drain off otherwise taxable corporate profits. Furthermore, the burden is on the taxpayer to show its right to the claimed deduction. Nowland v. Commissioner, 244 F.2d 450, 455 (4th Cir. 1957). The case of Gordy Tire Co. v. United States, 296 F.2d 476, 155 Ct.Cl. 759 (1961), relied upon by the taxpayer, is not applicable to the present situation because in that case plaintiff's evidence was not contradicted by the defendant. In our case there is evidence in support of the claims of each party. Compare J. H. Robinson Truck Lines v. Commissioner, 183 F.2d 739 (5th Cir. 1950), with Burford-Toothaker Tractor Co. v. Commissioner, 192 F.2d 633, 635 (5th Cir. 1951).

■ We are not persuaded by the Government's contention that the low rate of return realized by the taxpayer and the fact that it never paid any dividend support an inference that the disputed payments constitute a distribution of the profits of the taxpayer. Certainly the mere fact that a corporation has never paid any dividend would not, in and of itself, justify the conclusion that the salaries paid to an employee-stockholder were a distribution of dividend. There may be varied business reasons for the corporation to refrain from distributing dividends. Our trial commissioner has found that the business history of the taxpayer for its first 10 years can be summarized by the following table:

| Year | Capital stock | Net income after taxes | Retained earnings | Total invested capital |
|---|---|---|---|---|
| 1947 | $25,600.00 | $13,441.73 | $13,441.73 | $39,041.73 |
| 1948 | 25,600.00 | 8,996.04 | 22,437.77 | 48,037.77 |
| 1949 | 25,600.00 | 13,134.80 | 35,572.57 | 61,172.57 |
| 1950 | 25,600.00 | 19,203.99 | 54,776.56 | 80,376.56 |
| 1951 | 25,600.00 | 16,792.98 | 71,569.54 | 97,169.54 |
| 1952 | 25,600.00 | 2,362.35 | 73,931.89 | 99,531.89 |
| 1953 | 25,600.00 | 834.90 | 74,766.79 | 100,366.79 |
| 1954 | 25,600.00 | 382.03 | 75,148.82 | 100,748.82 |
| 1955 | 25,600.00 | 5,966.43 | 81,115.25 | 106,715.25 |
| 1956 | 25,600.00 | 12,979.94 | 94,095.19 | 119,695.19 |

Thus, the taxpayer's profits have been substantial, averaging more than $9,000 per year after taxes during this 10-year period. The rate of return on invested capital, after taxes, was over 50 percent in 1947 and over 30 percent in 1950. In order for the Government's contention to prevail, it must show that the low rates of return in the years in issue were caused by the disputed payments and not due to other reasons such as fluctuating business cycles.

■ We have carefully considered the record in this case and we conclude that a salary of $18,000 per year for Leo Bringwald would not be unreasonable. The comparison made by the Government between Leo Bringwald and Mr. Maloney, the general manager of Merchants Freight System, Inc., whose salary was about $9,200 per year, is not particularly useful because of the difference in their duties. The record [Tr. 161] indicates that Merchants Freight had, besides a general manager, a sales director who was paid about the same amount as Mr. Maloney. In the case of the taxpayer here, Leo Bringwald combined the two jobs and did them himself, although on a smaller scale. Contrary to the Government's suggestion that the business of the taxpayer was developed long before the years in issue, Leo Bringwald testified during the trial of this case [Tr. 52]:

"The Witness: This is a continuing thing, actually. As in many

businesses, customers come and go. The customer that they [Weston Paper] had in 1938 wasn't necessarily the same customers that they had in 1953, 1954, and 1955. This was a continuous thing, actually.

"It could be that customers that I was serving in 1953, 1954, and 1955, were actually solicited in 1940. It could be the customers that I served after 1955, for example were actually solicited in these years in question." [Explanation added.]

These were self-serving statements but we believe them to be credible. Since 98 percent of taxpayer's business was derived from the customers of Weston Paper, the importance of these sales and soliciting activities to the taxpayer is apparent.

The same can be said of the comparison between Leo Bringwald and Mr. Braunschweiger, whom Leo Bringwald hired to be the general manager of St. Marys Trucking Company. Braunschweiger did not own any proprietary interest in the company he managed and he was paid $10,000 per year for his services. The Government contends that this amount paid to Braunschweiger shows what the services of a general manager are worth to a company such as the St. Marys Trucking Company or the taxpayer. However, it appears from the record that Leo Bringwald developed the business of St. Marys Trucking Company and then put Braunschweiger in charge of its operations. We might infer that the testimony quoted in the preceding paragraph is equally applicable to the St. Marys Trucking Company. The fact that Leo Bringwald did not receive a salary from St. Marys Trucking Company does not mean that a salary, if paid, cannot be justified for tax purposes. The services rendered by Leo Bringwald to the taxpayer appear to be similar to the combined services rendered by Leo Bringwald and Braunschweiger to the St. Marys Trucking Company.

As to Mildred Bringwald, we conclude that a salary of $2,700 per year was justified. She served as secretary-treasurer and a director of the taxpayer. The Government attempts to downgrade her worth to the taxpayer by pointing to the fact that she was primarily a housewife and the fact that an office girl working a regular 40-hour week in the Vincennes office of the Bringwald Transfer, Inc., received for her services in 1953–1955, $2,-220, $2,466, and $2,544, respectively. Although Mrs. Bringwald did not work a regular 40-hour week, she was an officer of the taxpayer. Furthermore, her worth to the taxpayer may be enhanced by the fact that she was available to work with her husband at any time of the day.

For the above reasons we find that $18,000 per year for Leo and $2,700 per year for Mildred, for the years in issue, constitute reasonable compensation for personal services rendered to the taxpayer within the meaning of § 23(a) (1) (A) of the 1939 Code and of § 162(a) of the 1954 Code. Accordingly, the taxpayer is entitled to recover. The amount of recovery will be determined pursuant to Rule 47(c) (2).

### FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. *Plaintiff's corporate identity, ownership, and control.* The plaintiff, a corporation organized in 1946, is primarily a small truck-leasing company with its principal place of business in Terre Haute, Indiana. At all times material here, the plaintiff had one class of outstanding stock, consisting of 256 shares of no par value, Leo Bringwald owning 154 shares, Mildred Bringwald, his wife, 100 shares, and Mr. and Mrs. Will C. Bringwald, Leo's father and mother, one share each. Leo Bringwald was the president and general manager of the plaintiff company, and Mildred Bringwald was its secretary-treasurer. Plaintiff's books and records were kept and its tax returns were filed on the accrual

method and on the basis of fiscal years ending September 30.

2. *Salary deductions in issue.*

(a) During each of the calendar years 1953 through 1955 Leo and his wife were paid salaries by plaintiff of $24,000 and $2,700, respectively. However, since plaintiff was on an accrual basis for tax return purposes, in its tax returns for fiscal years ending September 30, 1953 through 1955, plaintiff deducted as officers' salaries the following amounts:

| Officer | 1953 | 1954 | 1955 |
|---|---|---|---|
| Leo Bringwald ................................... | $21,000 | $29,000 | $26,000 |
| Mildred Bringwald ............................ | 2,700 | 2,700 | 2,700 |

The total amounts shown in the schedule were paid in unequal amounts throughout the year, substantial payments having been made on the last day of the fiscal years, *viz.*, $9,000, $14,000, and $6,000, respectively.

(b) Upon audit of plaintiff's returns the Commissioner of Internal Revenue made certain adjustments not relevant to the present issues and disallowed the following portions of the amounts deducted by plaintiff as officers' salaries as being unreasonable:

| Officer | 1953 | 1954 | 1955 |
|---|---|---|---|
| Leo Bringwald ................................... | $9,000 | $17,000 | $14,000 |
| Mildred Bringwald ............................ | 2,100 | 2,100 | 2,100 |

Thus, $12,000 per year for Leo and $600 per year for Mildred was allowed as constituting reasonable compensation for the personal services rendered by them to the plaintiff.

3. *Payment of deficiencies.* The deficiencies assessed by the Commissioner in accordance with the above determination were paid as follows:

| Year | Tax paid Jan. 19, 1957 | Interest paid June 10, 1957 |
|---|---|---|
| 1953 ................................................. | $3,401.25 | $628.99 |
| 1954 ................................................. | 5,645.27 | 705.26 |
| 1955 ................................................. | 5,022.59 | 326.12 |

4. *Claims for refund.* Thereafter, on January 5, 1959, plaintiff filed claims for refund on Treasury Department Forms 843, in which the reasonableness of the determination with respect to officers' salaries was challenged.

5. *Absence of dividends.* No dividends have ever been formally paid by the plaintiff.

6. *Income, salaries, taxes.* The gross sales of the plaintiff, gross profit on sales, amounts paid as officers' salaries to Leo

and Mildred Bringwald, the net income before Federal taxes (without taking into consideration the adjustments attributable to the Commissioner's determination), and Federal taxes for the fiscal years 1947 through 1955, are as follows:

| Year | Gross sales [1] | Gross profit on sales | Amounts paid as officers' salaries [2] | | Net income before taxes | Federal taxes |
| | | | Leo | Mildred | | |
|---|---|---|---|---|---|---|
| 1947 | $108,483.37 | $37,962.97 | $8,932.90 | $1,749.75 | $17,326.93 | $3,885.20 |
| 1948 | 133,914.87 | 37,816.24 | 9,687.45 | 2,099.75 | 11,553.30 | 2,557.26 |
| 1949 | 144,441.89 | 47,004.00 | 9,530.00 | 2,100.00 | 16,928.31 | 3,793.51 |
| 1950 | 182,674.97 | 63,297.84 | 14,000.00 | 2,100.00 | 25,268.96 | 6,064.97 |
| 1951 | 213,413.92 | 77,037.97 | 21,000.00 | 2,550.00 | 23,168.70 | 6,375.72 |
| 1952 | 185,020.64 | 53,800.13 | 21,000.00 | 2,700.00 | 3,323.89 | 866.48 |
| 1953 | 175,610.93 | 52,340.03 | 21,000.00 | 2,700.00 | 1,567.70 | 470.31 |
| 1954 | 203,067.99 | 67,817.39 | 29,000.00 | 2,700.00 | 1,663.54 | 499.06 |
| 1955 | 224,838.95 | 74,707.72 | 26,000.00 | 2,700.00 | 8,731.27 | 2,619.38 |

[1] The gross sales figures reflected in the above schedule were computed on a calendar year basis and constitute the gross sales from the Terre Haute operation of Bringwald Transfer, Inc. (a separate company), as explained in later findings.

[2] There is no evidence that the returns of the plaintiff for years prior to 1953 were audited.

7. *Capital structure.* The capital stock of plaintiff, net income after taxes, retained earnings and total invested capital for fiscal years 1947 through 1956 (without taking into consideration the adjustments attributable to the Commissioner's determination), are as follows:

| Year | Capital stock | Net income after taxes | Retained earnings | Total invested capital |
|---|---|---|---|---|
| 1947 | $25,600.00 | $13,441.73 | $13,441.73 | $39,041.73 |
| 1948 | 25,600.00 | 8,996.04 | 22,437.77 | 48,037.77 |
| 1949 | 25,600.00 | 13,134.80 | 35,572.57 | 61,172.57 |
| 1950 | 25,600.00 | 19,203.99 | 54,776.56 | 80,376.56 |
| 1951 | 25,600.00 | 16,792.98 | 71,569.54 | 97,169.54 |
| 1952 | 25,600.00 | 2,362.35 | 73,931.89 | 99,531.89 |
| 1953 | 25,600.00 | 834.90 | 74,766.79 | 100,366.79 |
| 1954 | 25,600.00 | 382.03 | 75,148.82 | 100,748.82 |
| 1955 | 25,600.00 | 5,966.43 | 81,115.25 | 106,715.25 |
| 1956 | 25,600.00 | 12,979.94 | 94,095.19 | 119,695.19 |

8. *Equipment and employees.* The number of power units and semi-trailers operated, and drivers and helpers employed, in the Terre Haute operation for 1953–1955 were as follows:

| Item | 1953 | 1954 | 1955 |
|---|---|---|---|
| Power units operated | 11 | 10 | 11 |
| Semi-trailers operated | 17 | 17 | 18 |
| Drivers and helpers employed | 18 | 14 | 16 |

9. *Bringwald Transfer, Inc.* Bringwald Transfer, Inc. (not the plaintiff herein), is a certified truck-line carrier with its principal office in Vincennes, Indiana. It is subject to regulation by the Interstate Commerce Commission as an

irregular common carrier of general commodities in truckload lots between Terre Haute, Vincennes, Evansville, Princeton, Sullivan, Jasper, Shoals, New Albany on the one hand, and points and places in Illinois, St. Louis, Cincinnati and various border towns in Kentucky on the other. It was incorporated in 1951 and, during all years material here, was owned and operated by Will C. Bringwald. The business had been previously operated by Will C. Bringwald as a sole proprietorship.

10. *Development of Bringwald Transfer, Inc.* Will C. Bringwald started his sole proprietorship in 1918 hauling household effects in a Model T Ford truck for customers in the vicinity of Vincennes, Indiana. Until about 1940 he ran the business from his home, and its promotion was the dominant activity of the Bringwald family, to the exclusion of social activities. Mrs. Bringwald kept the business records and Will Bringwald drove the truck. Leo Bringwald, an only child, was born in 1916. The father's ambition was to have Leo join him in the business. Leo was reared in the shadow of his father's trucking business, and spent much of his spare time as a boy performing chores relating to it. He learned to drive a truck at the age of 12 years. When he became old enough for a license he drove a truck for his father at times when he was not in school. He graduated from high school in 1935 and thereafter drove a truck quite regularly for his father and performed a variety of work on trucks. He also performed other duties at his father's direction, such as typing.

11. *Development of Bringwald, Inc.* Leo Bringwald was married in 1938. At about that time his father used him in Vincennes to relieve him of some of his duties, and he spent less time driving. In the fall of 1938 the Weston Paper & Manufacturing Company engaged the father to haul a few loads of paper products between its plants in Terre Haute, Indiana, and St. Marys, Ohio. At the father's urging, the son purchased a truck and trailer and moved to Terre Haute for the purpose of capitalizing on the business from the Weston Paper Company. The son operated his own business in Terre Haute as a sole proprietorship until October 1946, when it was incorporated as Bringwald, Inc., in order to limit personal liability for damage claims from the truck business.

12. *Lease agreement between the two companies.*

(a) Neither the plaintiff nor the prior sole proprietorship of Leo Bringwald had a certificate of convenience and necessity from the Interstate Commerce Commission. At all times material, plaintiff operated by leasing its trucking equipment to Bringwald Transfer, Inc., or to the prior sole proprietorship of Will C. Bringwald. The business in Terre Haute was developed in the name of, and all revenues of the plaintiff flowed into, Bringwald Transfer, Inc. From the outset, however, it was agreed between Leo and his father that Leo, later the plaintiff, would receive the income from the Terre Haute business remaining after the deduction of certain expenses enumerated, during the years in issue, in the lease agreements. The books and records of both companies were kept in the offices of Bringwald Transfer, Inc., in Vincennes. The income from the Vincennes operation, for which Will C. Bringwald was responsible, went through one set of records, and the income from the Terre Haute operations, for which Leo Bringwald was responsible, went through another. In order to comply with the regulations of the Interstate Commerce Commission, these records were also combined to reflect the total business of Bringwald Transfer, Inc., in all locations.

(b) In substance, Leo Bringwald, later the plaintiff, was permitted use of the certificate of convenience and necessity possessed by Bringwald Transfer, Inc., with official consent. Leo had no financial interest in Bringwald Transfer, Inc., and received no salary therefrom for operating the Terre Haute business. His salary was paid by the plaintiff.

(c) Under the lease agreements between plaintiff and Bringwald Transfer,

Inc., during the years in issue, Bringwald Transfer, Inc., agreed to furnish all operators, drivers, mechanics and helpers, to pay all registration, license, tolls and ferry fees, special permit fees, and all maintenance operation expenses, to pay all operators, drivers, mechanics, and helpers and all payroll taxes, to keep in full force and effect during the terms of the lease, proper liability, property damage and cargo insurance on the leased equipment, to secure and furnish all necessary and appropriate authority from the Interstate Commerce Commission and the various state commissions and regulatory bodies to insure legal operation of the leased equipment, and to keep in full force and effect all necessary tariffs. Insofar as compensation for the leased equipment was concerned, the leases provided:

"Article 6. * * *.

"(b) That lessee shall pay the lessor the net earnings on the operation identified as the Terre Haute operation for Bringwald Transfer, Inc.

"It is understood and agreed that 'net earnings' shall mean the gross earning of the said 'Terre Haute' operation, less all operational costs and expenses, except any depreciation on automotive equipment which depreciation shall not be considered as an operational expense for the purpose of this lease."

13. *Gross sales, net earnings and taxable income.* Gross sales from the Terre Haute end of the Bringwald operations exceeded the gross sales from the Vincennes end by 33 percent and 24 percent in the calendar years 1954 and 1955, respectively. The "net earnings", as defined by the leases, received by the plaintiff from Bringwald Transfer, Inc., during the fiscal years 1953 through 1955 were $52,340.03, $67,817.39 and $74,707.72, respectively. In arriving at its taxable income, plaintiff deducted from the above amounts depreciation on equipment, officers' salaries, new tire expense, rent, various taxes, contributions, and certain other minor miscellaneous expenses.

14. *Weston Paper Company as principal customer.*

(a) When Leo Bringwald started the Terre Haute business in 1938 the Weston Paper & Manufacturing Company of Terre Haute and St. Marys shipped its paper products by rail to many if not all of its customers within a 250-mile radius. Leo persuaded many of these consignees within that radius to permit him to transport their consignments from Weston Paper Company by truck, which had certain advantages with respect to time, price, convenience, and specialized handling equipment. This was agreeable to Weston Paper Company. Since these shipments were freight prepaid the consignees would pay Weston Paper Company which would in turn pay Bringwald Transfer, Inc. Approximately 98 percent of the plaintiff's business during the years in issue was obtained from hauling paper for the customers of Weston Paper Company and its subsidiary, the Wabash Fibre Box Company, as reflected in the following schedule:

| Customers | 1953 | 1954 | 1955 |
|---|---|---|---|
| Weston Paper & Mfg. Co. | $144,773.94 | $171,198.00 | $183,929.99 |
| Wabash Fibre Box Co. | 27,181.26 | 39,402.10 | 36,160.01 |
| All other customers | 3,455.23 | 1,383.39 | 4,548.95 |

(b) Leo Bringwald was responsible for generating the business thus obtained for plaintiff. He solicited the consignees to arrange for shipment by trucks of Bringwald Transfer, Inc. By the end of 1955 he had obtained the business of 156 such consignees.

15. *Company office.* Leo and Mildred Bringwald's home, at all times material, was located adjacent to the garages and

parking area for plaintiff's trucks on a two-acre lot on the edge of Terre Haute. Plaintiff had no office as such in Terre Haute. Leo had a desk in the living room of his home and a file cabinet in the children's room. Signed bills of lading and bills from creditors were collected and forwarded to the Vincennes office where the books and records of both companies were kept. Leo personally solicited all the business for the Terre Haute operation of Bringwald Transfer, Inc., and had no salesmen employed for that purpose.

**16.** *Mildred Bringwald's services.*

(a) Mildred Bringwald performed the duties of housewife and mother. She did all of her own housework and has never had domestic help. She and Leo adopted two children in 1948 and 1951, respectively. During the years in issue, Mildred served as secretary-treasurer and a director of the plaintiff corporation. There was one meeting of the board of directors each year.

(b) Only part of Mildred's time was devoted to personal services for the plaintiff. Other than being a director, she answered the telephone in the house and helped in collecting bills of lading and bills from creditors which were forwarded to the Vincennes office for filing and/or payment, and in checking monthly statements against invoices and other charges. During the years involved, there was a telephone extension in the garage. When not in the house, Leo spent a fair amount of his time in the garage. It was understood that Mildred would let the phone ring a few times to see whether Leo or one of the men would answer it. If no one answered the phone on the garage extension Mildred would answer it and take any message.

(c) A young lady was hired in 1945 by Bringwald Transfer, Inc., to work in the Vincennes office. During the years involved, she kept the books and records for both companies, made out the checks, managed the office and took all telephone calls during working hours. She worked 40 hours a week, receiving for her services in 1953–1955, $2,220, $2,466 and $2,544, respectively.

**17.** *St. Marys Trucking Company.*

(a) After dealing with Weston Paper and Manufacturing Company for a while, Leo recognized that it had a need in St. Marys, Ohio, for the type of diversified transportation plaintiff was offering at Terre Haute. In 1948, after purchasing with his wife's money the necessary certificate of convenience and necessity from a St. Marys' individual, a new company, St. Marys Trucking Company, was incorporated. Its principal customer has also been Weston Paper. The stock was registered in the name of Mildred Bringwald, inasmuch as Leo felt that he should leave his name free and clear in order that passage of control to him of Bringwald Transfer, Inc., some time in the future, could be effected without complication. It was his understanding that the Interstate Commerce Commission would not permit one individual to own more than one certificate without a hearing and some justification.

(b) Norman Braunschweiger, who was one year older than Leo and an acquaintance, was hired as president of St. Marys Trucking Company. At the time he was hired in 1948, Norman was working at an order desk of the Hardware Supply Company in Terre Haute. As president of St. Marys Trucking Company, he lived in St. Marys and was responsible for the operation of the company under Leo's supervision and direction. Leo has been well-satisfied with Norman's services. During the years in issue, Leo's principal contact with Norman was by telephone. Although such calls were made at least three or four times a week, there may have been weeks in which no calls were made.

(c) By 1953 Norman had been president of St. Marys Trucking Company for five years. His compensation was $6,148.79 for 1953, $8,149.15 for 1954, and $10,000 for 1955. Mildred Bringwald received a salary from St. Marys Trucking Company of $4,000 in 1954, and $2,000 in 1955 but rendered no services for

the company. Leo did not receive a salary from this company.

(d) The gross sales of St. Marys Trucking Company, net income before and after taxes, and total invested capital at the beginning of the year, for 1953–1955 were as follows:

| Year | Gross sales | Net income | | Total invested capital |
|------|-------------|------------|-----------|------------------------|
| | | Before taxes | After taxes | |
| 1953 .......................... | $87,530.23 | $1,848.80 | $1,168.47 | $45,840.89 |
| 1954 .......................... | 95,142.85 | 6,342.32 | 4,439.62 | 47,009.36 |
| 1955 .......................... | 147,054.17 | 12,660.30 | 8,862.21 | 51,448.98 |

**18.** *Rowley Battery and Electric Service Company.* During the years in issue, Leo Bringwald also owned two-thirds of the stock of Rowley Battery and Electric Service Company, a Florida corporation located in Fort Lauderdale. Another man, the owner of the other one-third, managed the company. At times Leo spent as much as three weeks a year in Fort Lauderdale combining business with a vacation from his other interests. During other times, he kept in contact by weekly letters. The extent of his supervision was about the same as was the case with St. Marys Trucking Company.

**19.** *Merchants Freight System, Inc.*

(a) The general managers of two other Terre Haute trucking firms, neither of whom owned stock in their corporate employer, appeared as witnesses in this case. In one, Merchants Freight System, Inc., a Mr. Maloney was the general manager and for 1961 received as compensation $9,204. This man first became employed by Merchants Freight in 1946 after his separation from the service as a lieutenant colonel. His first job was more or less in a supervisory capacity for tire maintenance. Eventually he became safety director, later manager of operations, and then, on July 14, 1960, general manager. As general manager, he was in charge of the operation of the company, including sales, maintenance, administration and functioning of the organization. He was responsible for the hiring and supervision of approximately 165 employees. During 1961 this company owned 38 and leased approximately 50 tractors and owned 200 trailers. It has terminal facilities in St. Louis, Indianapolis, Chicago, Detroit, Cleveland, Columbus, and Cincinnati. The general manager is responsible for the operation of these facilities and the employees there involved. There were two other principal officers of the company in 1961 neither of whom received a salary or other compensation from the company. One of them was Vice President Cloutier and the other was Secretary Day. It is not believed that either of them spent much time at these jobs because of their other business affiliations not related to the business of Merchants Freight. Maloney was subject, however, to Cloutier's supervisory control. Maloney's range of duties and responsibilities was not as diversified for his company as was that of Leo Bringwald for the plaintiff company. Whereas Merchants Freight had separate divisions for operations, safety, traffic, and sales with different individuals at the head of each, and had a terminal manager for each of its terminals in the seven cities where it operated, Leo Bringwald performed all of these functions for the much smaller and less ramified plaintiff company. Thus, for example, Merchants Freight had a sales director who was paid about the same amount as Maloney. Maloney's company in 1961 paid salaries of from $7,020 to $7.800 each to its terminal managers, $7,020 each to the managers of certain of its divisions, and as much as approximately $10,000 to truck drivers, as compared with Maloney's salary of $9,204.

(b) During the years 1953–1955 the operating revenues, capital stock, accumulated earnings, and net income of Merchants Freight were as follows:

| Year | Operating revenues | Capital stock | Accumulated earnings | Net income before income taxes |
|------|------|------|------|------|
| 1953 | $2,836,116 | $36,000 | $335,675 | $59,000 |
| 1954 | 2,780,156 | 36,000 | 358,118 | 26,245 |
| 1955 | 3,153,198 | 36,000 | 342,854 | (15,264) |

———◆———

(c) It is concluded that the salary of Mr. Maloney of Merchants Freight is not a necessary criteria for determination of fair and reasonable compensation for Leo Bringwald's services to the plaintiff company during the years in question, because the nature and scope of their duties and responsibilities were not comparable.

### 20. *Motor Freight Corporation.*

(a) In the other company, Motor Freight Corporation, the general manager and secretary-treasurer, Mr. Cheek, was hired in that dual capacity in 1940 when the company's business was quite small, and became a member of its Board of Directors. The stock of the company is wholly owned by a Mr. Adams and his wife. In the earlier years of his employment Cheek did bookkeeping and attended to the payroll and other clerical matters, but acquired additional help as the business grew. He was responsible for the operation of the business, including the supervision of all departments and terminals. Mr. Adams had a part-time office at the company but gave little direct supervision to its day-to-day affairs. He had a nearby automobile agency during the years involved and visited the company frequently, spending about half as much time there as Cheek. He gave Cheek free reign in running the company pursuant to policies and directives laid down by the President and Board of Directors. For example, Adams would discuss with Cheek such matters as the purchase of equipment or the extension of operations. Mr. Adams controlled the ultimate management of the company and Cheek assisted him in it. Cheek was in charge of hiring help for the company, except that at the branch terminals the branch managers would discharge this function. It is fair to say that Motor Freight has been well-managed and that the growth and success of the company has been in large measure attributable to Cheek's efforts. At various times during the years involved the company had 64 to 72 tractors, 27 to 29 trucks, and 87 to 116 trailers. The gross receipts, net income, invested capital ($3,750 capital stock plus accumulated profits), and the compensation received by Cheek for his services for the years 1952–1955 were as follows:

| Year | Gross receipts | Net income before taxes | Invested capital (end of year) | Compensation paid general manager | |
|------|------|------|------|------|------|
| | | | | Basic salary | Bonus |
| 1952 | $1,539,018.00 | $60,037.00 | (1) | $7,500.00 | $6,907.00 |
| 1953 | 1,933,142.00 | 81,059.34 | $236,193.54 | 7,800.00 | 10,855.00 |
| 1954 | 2,181,419.00 | 50,370.00 | 285,983.40 | 12,000.00 | 7,341.00 |
| 1955 | 2,495,698.00 | 96,760.00 | 349,137.72 | 12,500.00 | 9,153.00 |

1 Not shown.

The company has paid no dividends in the ten years preceding the time of trial because it considered itself too heavily in debt to do so. Mr. Adams received a salary of $15,000 plus expenses of $780 in each of the years 1953, 1954 and 1955. In each of the same years Mrs. Adams received a salary of $600. In addition, in 1954 Mrs. Adams was paid $9,812.98 for the lease of two tractors which she apparently owned and leased to the company, and in 1955 received $19,556 for the lease of three tractors. In 1954 a Ronald Adams (affiliation not determinable) received $9,228.13 for the lease of one tractor to the company, and in 1955 he received $14,965 for the lease of two tractors. It is not known precisely what services Mrs. Adams rendered to the company, nor whether the Commissioner of Internal Revenue challenged the deductions for payments of salary, etc., to members of the Adams family.

(b) Motor Freight was a much larger company than the plaintiff corporation. It had a large payroll including, in addition to the officials mentioned, separate managers for its traffic, sales and operations divisions, each of which managers had an assistant. Each of the division managers was paid approximately $150 weekly in 1954.

**21.** *Gerard Motor Express.* The plaintiff has requested certain findings relating to the salaries and bonuses paid by Gerard Motor Express to the members of the Gibbons family who owned its stock and served as its officers. These requested findings are based exclusively on annual reports filed by Gerard Motor Express with the Interstate Commerce Commission which are in evidence as a defendant's exhibit. No witnesses were called to support or expand upon the contents of the said reports, and nothing can be determined from them as to the nature of the services rendered by the members of the Gibbons family in exchange for their earnings. It is, therefore, concluded that, despite certain points of surface similarity between the salaries paid by Gerard and those paid by plaintiff company, no reliance can be safely placed on the comparison in the absence of knowledge as to the nature of the services rendered by the Gibbons family.

CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c) (2).