**JONES BROTHERS BAKERY, INC.**

v.

**The UNITED STATES.**

No. 9-66.

United States Court of Claims.
June 20, 1969.

William C. Gifford, Jr., Washington, D. C., for plaintiff. Richard B. Barker, Washington, D. C., attorney of record. Ivins, Phillips & Barker, Washington, D. C., of counsel.

Norman J. Hoffman, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM: *

The plaintiff is seeking in this case to recover refunds of income taxes previously paid for the fiscal years 1959, 1960, and 1961.[1]

It is our opinion that the plaintiff is entitled to a partial recovery for each of the years involved in the present action.

### Introduction

The plaintiff is a corporation, organized under the laws of the State of North Carolina. Since its incorporation in 1928, the plaintiff has been engaged in the baking business. It bakes bread and rolls, and sells them at wholesale, principally under the trade name "Holsum." The plaintiff also sells cakes at wholesale. It does not bake the cakes, but purchases them elsewhere for resale.

The plaintiff's sales are all on consignment, in that its bread, rolls, and cakes are initially sold to a retail outlet, such as a grocery store, where the products are put on the grocery store's racks or shelves for sale to consumers. Each product is "coded" in relation to a date; and any product that is not sold by the retail outlet within the "code" period is picked up by the plaintiff's salesman, and credit is given the grocery store for it. For example, the plaintiff allows bread to stay on a grocery store's shelves no longer than 2 days. The "stales," as the returned loaves are called, are disposed of at salvage prices through several retail outlets maintained by the plaintiff for that purpose. If the surplus stores are unable to sell them, the "stales" are sold to farmers for livestock feed at 2½ to 3 cents a pound.

The plaintiff's principal place of business is located in Greensboro, North Carolina. Its sales territory during the years in issue encompassed approximately 16 counties in the area around Greensboro.

The plaintiff was founded by O. C. Jones. He was the plaintiff's principal shareholder and chairman of the plaintiff's board of directors as long as he lived, and he was also the plaintiff's president for more than 18 years.

For a number of years after the plaintiff's incorporation in 1928, brothers of O. C. Jones were shareholders, officers, and directors of the plaintiff—hence, the corporate name, "Jones Brothers Bakery, Inc." However, the brothers of O. C. Jones ceased their connection with plaintiff long before the time that is involved in the present litigation. O. C. Jones himself died on August 8, 1953, which was several years before the period in issue.

---

\* This opinion incorporates the opinion of Trial Commissioner Mastin G. White, with minor changes so as to increase the amounts allowed as reasonable compensation for services rendered by the officers of the taxpayer corporation for each of the years 1959, 1960, and 1961.

1. The plaintiff operates on the basis of a fiscal year that ends on April 30 of each calendar year.

During the period with which we are concerned, the plaintiff's shareholders and officers were Paul C. Jones, Miss Ora E. Jones, Mrs. Gladys J. Chappell (nee Gladys Jones), and Mrs. Claudia L. Jones. Mrs. Claudia L. Jones is the widow of O. C. Jones; and Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell are the children of O. C. Jones and Mrs. Claudia L. Jones.

During the years in issue, Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell each owned 44½ shares (or 27.8 percent) of the plaintiff's 160 outstanding shares of common stock, and Mrs. Claudia L. Jones owned 26½ shares (or 16.6 percent) of the plaintiff's stock. Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell constituted the plaintiff's board of directors.

### Officers' Compensation

The principal problem in the present case is to determine whether the Internal Revenue Service acted properly or improperly in disallowing portions of the amounts which the plaintiff paid to Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell as compensation for the fiscal years 1959, 1960, and 1961, and which the plaintiff claimed on its Federal income tax returns for those years as deductible business expenses.

For the fiscal year 1959, the plaintiff paid a total of $68,778.03 to Paul C. Jones as compensation, it paid a total of $36,-941.81 to Miss Ora E. Jones as compensation, and it paid a total of $21,986.21 to Mrs. Gladys J. Chappell as compensation; and the plaintiff claimed these several amounts as deductible business expenses on its Federal income tax return for 1959. Upon auditing the plaintiff's income tax return for 1959, the Internal Revenue Service determined that $24,-508.03 of the amount paid to Paul C. Jones, that $15,691.81 of the amount paid to Miss Ora E. Jones, and that $12,056.21 of the amount paid to Mrs. Gladys J. Chappell constituted unreasonable compensation. Thus, the IRS allowed the plaintiff to deduct only $39,270 as reasonable compensation to Paul C. Jones,

$21,250 as reasonable compensation to Miss Ora E. Jones, and $9,930 as reasonable compensation to Mrs. Gladys J. Chappell.

For the fiscal year 1960, the plaintiff paid to Paul C. Jones as compensation the total amount of $58,627.08 (of which the Internal Revenue Service disallowed the sum of $28,350.68 and allowed the sum of $30,276.40 as reasonable compensation); the plaintiff paid to Miss Ora E. Jones as compensation the total amount of $33,851.25 (of which the Internal Revenue Service disallowed the sum of $17,419.25 and allowed the sum of $16,-432 as reasonable compensation); and the plaintiff paid to Mrs. Gladys J. Chappell as compensation the total amount of $19,925.83 (of which the Internal Revenue Service disallowed the sum of $12,-244.23 and allowed the sum of $7,681.60 as reasonable compensation).

For the fiscal year 1961, the plaintiff paid to Paul C. Jones as compensation the total amount of $48,370.93 (of which the Internal Revenue Service disallowed the sum of $17,136.93 and allowed the sum of $31,234 as reasonable compensation); the plaintiff paid to Miss Ora E. Jones as compensation the total amount of $27,-697.56 (of which the Internal Revenue Service disallowed the sum of $10,752.56 and allowed the sum of $16,945 as reasonable compensation); and the plaintiff paid to Mrs. Gladys J. Chappell as compensation the total amount of $15,823.37 (of which the Internal Revenue Service disallowed the sum of $7,902.37 and allowed the sum of $7,921 as reasonable compensation).

In determining whether the claimed deductions were or were not properly allowable as reasonable compensation, the court is dealing with a question of fact that must be decided in the light of all the facts and circumstances involved in the case. Bringwald, Inc. v. United States, 334 F.2d 639, 643, 167 Ct.Cl. 341, 347 (1964); Boyd Construction Co. v. United States, 339 F.2d 620, 624, 168 Ct.Cl. 579, 586 (1964). Accordingly, it is necessary to set out the pertinent facts in considerable detail.

Paul C. Jones was born on November 30, 1921. As a young boy and while attending high school, he worked in the plaintiff's bakery at various points along the production line on Saturdays and in the summertime.

Paul C. Jones received 2 years of junior college training at the Oak Ridge Military Institute, where he took a liberal arts course, including mathematics and science. He did not receive an academic degree.

In 1942, Paul C. Jones was commissioned a second lieutenant in the United States Army. After attending schools in the military service and receiving additional training, he served as an instructor in armored vehicles at Fort Knox, Kentucky. Thereafter, he transferred to the Army Air Corps and became a fighter pilot in 1945. He was released from the military service in the latter part of December 1945 as a captain. He became a full-time employee of the plaintiff upon his release from the military service, and he has worked full-time for the plaintiff ever since then.

Miss Ora E. Jones began working at the plaintiff's bakery during her high school years on a part-time basis in the wrapping and retail departments. She graduated from Greensboro High School in 1935.

After graduating from high school, Miss Ora E. Jones attended Salem Academy in Winston-Salem, North Carolina, for a year, and then attended Greensboro College, from which she graduated *magna cum laude* in 1940, with a liberal arts major in mathematics and a minor in English.

In August 1940, Miss Ora E. Jones went to work for the plaintiff on a full-time basis, and she has continued to work full-time for the plaintiff ever since 1940. She started out as an assistant to the office manager. She held this position until January 30, 1945, when she became the office manager.

While in high school, Mrs. Gladys J. Chappell—then Miss Gladys Jones—began working part-time at the plaintiff's bakery on weekends, on holidays, and during the summer months.

After graduating from Greensboro High School, the then Miss Gladys Jones attended Greensboro College for 2 years, taking courses principally in home economics, and she attended Guilford College for ½ year. She did not graduate from college.

When Paul C. Jones returned to Greensboro from the military service in December 1945 and became a full-time employee of the plaintiff, O. C. Jones was a very sick man. He had suffered a heart attack and was not physically capable of any sustained activity. Because of this, O. C. Jones turned over the responsibility for managing the bakery to his children as soon as possible. On February 25, 1946, O. C. Jones' brothers, who had been serving as members of the plaintiff's board of directors, resigned as directors, and Paul C. Jones and Miss Ora E. Jones were elected to serve with their father as members of the board.

The then Miss Gladys Jones became a full-time employee of the plaintiff in May 1946, when she was 20 years old. She worked in the office.

On June 4, 1946, Paul C. Jones became vice president and Miss Ora E. Jones became secretary-treasurer of the plaintiff.

The then Miss Gladys Jones continued to work full-time for the plaintiff until October 26, 1946, when she was married to Wallace P. Chappell and moved to Creedmoor, North Carolina, which is located about 70 miles from Greensboro.

On December 16, 1946, Paul C. Jones was elected as president of the plaintiff, O. C. Jones stepped down to a position as vice president, Mrs. Gladys J. Chappell was elected as a vice president of the plaintiff, and Miss Ora E. Jones was re-elected as secretary-treasurer of the plaintiff. On the same day, Mrs. Chappell was elected as a member of the plaintiff's board of directors. Thereafter, until the death of O. C. Jones on August 8, 1953, the plaintiff's board of directors consisted of O. C. Jones as chairman of the board and his children, Paul C. Jones,

Miss Ora E. Jones, and Mrs. Gladys J. Chappell, as members of the board.

Perhaps it should be mentioned at this point that although Mrs. Gladys J. Chappell ceased to be a full-time employee of the plaintiff upon her marriage and removal from Greensboro to Creedmoor in October 1946, she continued to work for the plaintiff on a part-time basis for the next 7 years. She assisted in the office, principally as a replacement for office employees during their vacations. During this period, Mrs. Chappell commuted between Creedmoor and Greensboro, a distance of about 70 miles, two or three times a week; and, in addition, she spent one week out of every month in Greensboro. As children were added to her family (she has two children), Mrs. Chappell was accompanied by her children on her trips to Greensboro, and they would stay at the home of her parents. Mrs. Chappell resumed full-time work for the plaintiff in 1953, under circumstances to be related later.

Since the death of O. C. Jones on August 8, 1953, the plaintiff's board of directors has consisted of Paul C. Jones as chairman of the board and his sisters, Miss Ora E. Jones and Mrs. Gladys J. Chappell, as members of the board.

Effective August 24, 1953, following the death of O. C. Jones, the plaintiff's officers consisted of Paul C. Jones as president and general manager, Miss Ora E. Jones as first vice president, secretary, and treasurer, and Mrs. Gladys J. Chappell as second vice president and assistant secretary. This line-up of officers continued until June 7, 1955. From that date until the present time, the officers of the plaintiff have consisted of Paul C. Jones as president and general manager, Miss Ora E. Jones as first vice president, secretary, and treasurer, Mrs. Gladys J. Chappell as second vice president and supervisor in charge of Durham operations (the Durham operations will be discussed subsequently), and Mrs. Claudia L. Jones as assistant secretary and assistant treasurer (Mrs. Claudia L. Jones has never taken an active part in the actual management of the plain-

tiff). During the period involved in the present litigation, therefore, the four persons mentioned in the preceding sentence were the officers and the sole stockholders of the plaintiff, and the first three persons constituted the plaintiff's board of directors.

In 1946, when Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell became officers and directors of the plaintiff, the plaintiff served a market area covering only Greensboro and the towns within 25 miles of Greensboro, including Reidsville to the north, Burlington to the east, Asheboro to the south, and High Point to the west. The net sales of bread, rolls, and cakes were slightly over $700,000 per year. The bread, rolls, and cakes were distributed by salesmen from the plaintiff's bakery in Greensboro at wholesale to retail outlets, mostly small, independent "mom and pop" grocery stores, although there were a few A&P chain stores among the plaintiff's customers. Cakes have always been purchased by the plaintiff for resale. Bread and rolls, however, were produced by the plaintiff through the conventional method of making bread, which was quite complicated and took roughly 12 hours. The bakery's total capacity was approximately 1,800 pounds per hour at that time. The plaintiff's production capacity was limited because the oven had to be utilized to bake the rolls first before the loaves of bread could be produced. The total number of employees was approximately 50–60.

By 1947, the plaintiff was operating 16 routes that served 880 customers. The plaintiff's employees numbered 66.

By the time of O. C. Jones' death in August 1953, the plaintiff had increased its sales to $1,067,000 in the fiscal year 1953. It was then operating 25 routes from its Greensboro bakery and serving 1,250 customers in 6 counties. The number of employees had increased to 93.

Prior to 1953, all of the plaintiff's routes were operated out of its Greensboro bakery. In an effort to increase its sales and to facilitate the distribution of

its products to its customers, the plaintiff established relay distribution points in several North Carolina cities, as follows: in Durham on July 29, 1953; in Asheboro on May 1, 1956; in Raleigh on November 30, 1956; in Sanford on September 15, 1958; and in Albemarle on May 1, 1959. At each relay distribution point, the plaintiff employed a route supervisor, who had the responsibility of seeing to it that the routes operating from the station were properly served by the route salesmen.

The number of routes operated by the plaintiff had expanded to 51, 61, and 57 in the fiscal years 1959, 1960, and 1961, respectively; and the customers served by these routes numbered 2,448 in 1959, 3,050 in 1960, and 2,793 in 1961. The plaintiff's sales territory had expanded to 16 counties in the area around Greensboro by the 1959–1961 period; and the plaintiff's net sales had increased to $2,276,075 in 1959, to $2,734,044 in 1960, and to $2,565,916 in 1961. The plaintiff's net worth had increased from $213,428.36 at the end of the fiscal year 1953 to $430,151.80 at the end of the fiscal year 1959, to $479,893.72 by the end of the fiscal year 1960, and to $516,037.05 by the end of the fiscal year 1961. The plaintiff's employees numbered 178 in 1959, 160 in 1960, and 162 in 1961.

The large expansion in the plaintiff's operations and business between 1946, when Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell became officers and directors of the plaintiff, and the 1959–1961 period that is involved in the present litigation was not accomplished in any easy fashion. The bread industry is a highly competitive industry. In particular, the environment in which the plaintiff operates has always been a low-price, highly competitive market area, with wholesale bakery prices well under the prices prevailing in the rest of the United States. This situation has been aggravated by the growth of chain supermarkets that bake their own bread and then sell it in their own stores at a lower price—and display it on their racks or shelves more advantageously—than the bread which they offer for sale from the production of other bakeries, such as the plaintiff.

Because of the pressure from the increasing number of chain supermarkets, the plaintiff has added routes in almost every year since 1949, only to find its sales per mile of travel decreasing, thus indicating that the plaintiff has been forced to travel farther and farther in order to keep its volume up and expand it.

The plaintiff has been able to overcome the competition from chain supermarkets by offering the public products of better quality than those produced by the supermarkets.

The plaintiff's ability to produce high-quality products at competitive prices has been attributable in large part to a program that was inaugurated and accomplished under the leadership of Paul C. Jones for the modernization and improvement of the plaintiff's plant and operations. When Paul C. Jones became a full-time employee of the plaintiff after being released from the military service in December 1945, he was assigned the task of studying the physical operations in the bakery and determining the plaintiff's efficiency in terms of the number of pounds of production per man per hour. He talked to salesmen who visited the plaintiff's plant for the purpose of selling supplies to the plaintiff, and sought their opinions as to where the most modern bakery in the country was located. He learned that everyone in the baking business was talking about the Fuchs Bakery in Miami, Florida, because it was able to produce 8,000 pounds of baked bread per day with six or eight men. Paul C. Jones went to Miami, became a good friend of the owner of the Fuchs Bakery, went through the plant there, and observed its operations. On the basis of this observation, he concluded that the plaintiff was far behind the Fuchs Bakery in operating efficiency.

Upon the basis of the report made by Paul C. Jones, it was decided by the plaintiff's management that steps

should be taken to improve and modernize the plaintiff's production facilities. The plaintiff's management had plans drawn up for the construction of a new plant, and then went to the Jefferson Life Insurance Company to find out whether the plaintiff could borrow the money that would be necessary in order to build the proposed new plant. The insurance company indicated that perhaps a loan to finance the construction of the new plant would be made if it were permitted to name a person to serve on the plaintiff's board of directors. The suggestion made by the Jefferson Life Insurance Company that it be permitted to name a member of the plaintiff's board of directors was unsatisfactory to the plaintiff's management, so the plan to build a new plant was abandoned. Instead, the plaintiff's management decided that the plaintiff would inaugurate and carry out a gradual improvement program.

A faster bread wrapper, a divider, and several faster slicing machines were purchased in 1947 and 1948 (Paul C. Jones having become president of the plaintiff on January 1, 1947). A second rounder and a larger and faster proof box were purchased in 1949. A mixing machine, of twice the capacity theretofore available, was purchased in 1950, along with a larger proof box. Faster slicing machines and wrapping machines were purchased in 1951 and 1952, along with a new pan-o-mat for dividing rolls in order to speed up the roll production. Because the mixing and dividing had been speeded up, a larger oven was purchased in 1952. A pan-return conveyor system was installed in 1953.

Prior to and through the early 1950's, one of the factors limiting the expansion of the plaintiff's business was the inordinate amount of time, labor, and expense involved in procuring and utilizing bagged flour. In the early 1950's, Paul C. Jones heard that an experiment with the bulk transfer and storage of flour was being conducted, so he went to Kansas City in order to discuss with major millers the possibility of working out a plan

for the bulk transportation of flour to, and the bulk storage of flour in, Greensboro, so as to eliminate bags, freight on bags, and the handling of bags. International Mills, General Mills, and Pillsbury were interested in making bulk sales of flour, but they were not interested in assuming the responsibility for the transportation of such flour to Greensboro.

Paul C. Jones next went to Salina, Kansas, in 1953 or early in 1954 and conferred with John Vanier, president of The Weber Flour Mills in that city. The Weber Flour Mills had previously installed a bulk-flour facility at a local bakery in Salina, and Mr. Vanier took Mr. Jones to see that facility. At the time, it was the only bulk-flour facility that had been installed at a medium-sized bakery anywhere in the United States (although a large facility of this type had been installed in Toledo, Ohio).

Mr. Vanier was interested in the project suggested by Paul C. Jones. He went to Greensboro, looked over the situation there, and made arrangements for the establishment and maintenance of a bulk-flour terminal in a building owned by the Southern Railway. The plaintiff then constructed on its property a facility for the storage of flour in bulk. The Weber Flour Mills' bulk-flour terminal in Greensboro and the plaintiff's bulk-flour storage facility were established in 1955, and they were the first installations of this type in the Carolinas. Since 1955, every major baking plant in the Carolinas has shifted to the use of flour in bulk.

In 1956 and 1957, some additional machinery was installed by the plaintiff to speed up the roll production and bread cooling systems.

In 1959, Paul C. Jones heard of an experimental continuous-mix machine, called the Amflow, manufactured by the American Machine & Foundry Company. One of these machines had been installed at a bakery in Anna, Illinois, and Mr. Jones went to see this machine in 1959. It was not a completely workable machine at the time. Paul C. Jones made

some good suggestions to the Bakery Equipment Division of the American Machine & Foundry Company for improving the Amflow continuous-mix machine, and he made arrangements with AMF to put one of its Amflow machines in the plaintiff's plant at Greensboro. In conjunction with the plaintiff, AMF was able thereafter to perfect the Amflow continuous-mix machine so as to produce an acceptable, saleable loaf of bread. The Amflow continuous-mix machine cut the production in the plaintiff's plant for a loaf of bread from 12 hours to approximately 5½ hours, and increased the plaintiff's production capacity to approximately 5,000 pounds an hour, with the number of production workers cut by two-thirds.

In 1960, the plaintiff installed a new liquid-sugar tank, which again speeded up the production process by eliminating bagged granulated sugar.

Since becoming the plaintiff's president on January 1, 1947, Paul C. Jones has had the sole responsibility for the purchasing of all equipment acquired by the plaintiff, and he has played the leading role in planning and carrying through to fruition the plaintiff's modernization and improvement program.

The plaintiff's management, in expanding the plaintiff's business despite a difficult competitive situation, has not only devoted a great deal of time and effort to improving the plaintiff's plant and operating efficiency, but has also paid close attention to the control of costs. One of the important elements of cost control has consisted of diligent attention to purchasing. With the exception of flour and equipment (which are purchased by Paul C. Jones), Miss Ora E. Jones has had the sole responsibility for the plaintiff's purchasing. This has required her to maintain accurate and up-to-the-minute records with respect to inventories, and to watch the markets continuously so as to be in a position to make the best purchases, in the proper quantities, and at advantageous times. Most of the supplies and articles purchased by Miss Jones fluctuate almost daily in price. By exceedingly careful and diligent attention to the details of the inventory, market prices, and quantities, Miss Jones has been highly successful in keeping the plaintiff's purchasing costs to a minimum. Miss Jones is responsible for purchases ranging between $500,000 and $750,000 per year for materials and supplies. She deals with 29 or more major suppliers.

In addition to purchasing, Miss Ora E. Jones reviews the voluminous cost control data each day, first, to check its accuracy and, second, to do something about reducing any costs that are out of line. Based on her experience with cost control data, Miss Jones is frequently able to spot a problem and correct it immediately.

Miss Ora E. Jones also exercises general supervision over all office work, is responsible for all reports, returns, and payrolls, and is in complete charge of operations at night and when Paul C. Jones is absent from Greensboro.

As indicated heretofore in this opinion, Paul C. Jones and Miss Ora E. Jones were the top executives in charge of the plaintiff's operations during the period that is involved in the present litigation. They were assisted in the performance of their functions by a sales manager, an assistant sales manager, a production manager, and an office manager at the plaintiff's headquarters in Greensboro.

Mrs. Gladys J. Chappell is in a different category from her brother, Paul C. Jones, and her sister, Miss Ora E. Jones. As indicated previously in this opinion, she—at the age of 20 and as Miss Gladys Jones—worked full-time for the plaintiff as an office employee during a portion of 1946. Upon her marriage and removal from Greensboro to Creedmoor in October 1946, she ceased to be a full-time employee of the plaintiff, although she continued to work for the plaintiff on a part-time basis for approximately 7 years after 1946. Mrs. Chappell resumed full-time work for the plaintiff in July 1953. This occurred in connection with the establishment by the plaintiff of a relay distribution point in Durham,

North Carolina, which is fairly near Mrs. Chappell's home in Creedmoor.

As a matter of fact, Mrs. Chappell was responsible for the plaintiff's entry into the Durham market area. In 1953, another bakery that had been distributing bread in the Durham area under the "Holsum" trade name pulled out of the Durham area, making it possible for the plaintiff to enter that area with its "Holsum" products. Mrs. Chappell got in touch with various food dealers in the Durham area and persuaded them to allow the plaintiff to put its Holsum products into the grocery stores. She hired a supervisor for the Durham operations and introduced him to each of the grocerymen in the area. Mrs. Chappell found a temporary location for the relay distribution point on West Geer Street, and this was used by the plaintiff until Mrs. Chappell later found a permanent location at 500 Rigsby Avenue in Durham. The plaintiff's operations in the Durham area started with one route in 1953. By 1954, there were five routes operating out of the Durham distribution point.

In November 1956, Mrs. Chappell spearheaded for the plaintiff the establishment of a relay distribution point in Raleigh, North Carolina, for the distribution of the plaintiff's products in the Raleigh market area. She found a location on West Hargett Street in Raleigh for the station. She met with food dealers, employed personnel, and set up routes for the Raleigh area.

During the years in issue, Mrs. Gladys J. Chappell was the plaintiff's manager in overall charge of the operations in the Durham and Raleigh market areas. The plaintiff also maintained a sales manager in Durham, and maintained at the Durham and Raleigh relay distribution points supervisors performing functions similar to those performed by supervisors at other relay distribution points.

The plaintiff's sales in the Durham and Raleigh areas totaled $454,334.57 in the fiscal year 1959, $507,594.92 in the fiscal year 1960, and $564,100.50 in the fiscal year 1961.

Mrs. Gladys J. Chappell was also a member of the plaintiff's board of directors during the years in issue (and, indeed, at all times since December 16, 1946). As such, she participated in all the major policy decisions that were made for the plaintiff.

In addition, Mrs. Chappell had the title of second vice president of the plaintiff during the years in issue, but the record does not disclose the nature of the duties, if any, that she performed in this capacity.

Since Paul C. Jones is the key figure in the plaintiff's management, consideration will first be given to the reasonableness of the amounts of $68,778.03, $58,627.08, and $48,370.93 which the plaintiff paid to him as compensation for the fiscal years 1959, 1960, and 1961, respectively.

■ As stated earlier in this opinion, the reasonableness of compensation in a tax case of this type is a question of fact. While there is no definite formula by which the question of the reasonableness, for income tax purposes, of compensation in any particular instance can be determined (Irby Construction Co. v. United States, 290 F.2d 824, 826, 154 Ct.Cl. 342, 346 (1961)), there are several factors which the courts regard as pertinent to such an inquiry.

Perhaps the most significant factor in passing upon the reasonableness of compensation in a tax case is a comparison between the compensation that is under consideration and the prevailing rates of compensation paid to the holders of comparable positions by comparable companies within the same industry. R. J. Reynolds Tobacco Co. v. United States, 149 F.Supp. 889, 138 Ct.Cl. 1, 14 (1957), cert. den., 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957); Patton v. Commissioner of Internal Revenue, 168 F.2d 28, 31 (6th Cir. 1948). Unfortunately, as regards the reasonableness of the compensation which the plaintiff paid to Paul C. Jones, the record in the present case does not contain evidence in the field of comparability that is entirely satisfactory.

The record does contain evidence, brought out by the defendant, to the effect that the chief executive officer of a bakery located in Wilson, North Carolina, who was the sole manager of the business and had complete responsibility for all its operations, including sales, production, purchasing, and finances, received $9,100 per year as compensation. However, the bakery in Wilson had annual sales of only $1,200,000, in comparison with the plaintiff's annual sales of approximately twice that volume in the fiscal years 1959, 1960, and 1961.

The defendant also presented at the trial evidence to the effect that, according to the American Management Association's Executive Compensation Survey concerning the compensation paid in 1960 to the executives of companies operating in the consumer products-food field, the total annual compensation paid to the chief executive officers of such companies having annual sales between $2,000,000 and $4,000,000 (the plaintiff's sales during the fiscal year 1960 amounted to $2,734,044) averaged $27,100 per year; and that, according to a similar survey for 1961, the total annual compensation paid to the chief executive officers of companies having annual sales between $2,000,000 and $3,000,000 (the plaintiff's sales amounted to $2,565,916 in the fiscal year 1961) averaged $26,800. These average compensations of $27,100 per year for 1960 and $26,800 per year for 1961 contrast with Paul C. Jones' compensation of $58,627.08 for 1960 and $48,370.93 for 1961. Of course, the showing of comparability is very weak. Also, the record demonstrates that Paul C. Jones' competency and the value of his services to the plaintiff are far above average.

In addition, the defendant showed at the trial that the top executive officer of the Guilford Dairy Cooperative Association, Inc.—a dairy cooperative located in Greensboro and engaged in the business of processing milk and manufacturing other milk products for resale at both wholesale and retail—received a total compensation of $40,175 for 1959 (as contrasted with Paul C. Jones' total compensation of $68,778.03 for the fiscal year 1959); that the chief executive of the dairy received a total compensation of $39,975 for 1960 (as contrasted with Paul C. Jones' total compensation of $58,-627.08 for the fiscal year 1960); and that the chief executive of the dairy received a total compensation of $40,411 for 1961 (as contrasted with Paul C. Jones' total compensation of $48,370.93 for the fiscal year 1961).

In this connection, the defendant presented a considerable amount of evidence concerning the Guilford Dairy, and such information is summarized in findings 80–119. There are a number of similarities between the plaintiff and the Guilford Dairy: e. g., both are engaged in the manufacturing and processing of basic food products; both have their principal places of business in Greensboro and serve comparable geographical areas; both have gradually expanded their sales areas by the additions of sales branches in other nearby cities; both distribute their products through route salesmen; both guarantee their sales on the wholesale level of commerce, and take back the products that are not sold by their customers within specified periods; both are engaged in very competitive businesses; both have substantial investments in their plants and equipment; both have gone through extensive programs for the modernization and improvement of their plants and equipment; both pay compensation to their top executives in the form of a fixed salary and a bonus; and both are headed by chief executives who are highly competent and experienced. On the other hand, the Guilford Dairy is different from the plaintiff in a number of important respects: e. g., it is an agricultural marketing cooperative association and is not organized to make a profit for itself, but to earn money for its members as milk producers; it does not have to buy its raw material on the open market at advantageous prices, but, instead, receives from its members a continuous supply of milk without having to com-

pete for it; and a substantial percentage of its sales are at retail to households, such sales being final and not involving the possible return of "stales."

As previously stated, the evidence in the record with respect to the matter of comparability is not entirely satisfactory. However, the court must decide cases on the basis of the data that the parties present to it; and the only evidence furnished to the court in the general area of comparability tends to show that the amounts which the plaintiff paid to Paul C. Jones as compensation for the fiscal years 1959, 1960, and 1961 were, to some extent, excessively high.

■ Where the reasonableness of compensation is involved in a tax case, the taxpayer has the burden of proof with respect to this factual issue. Duffin v. Lucas, 55 F.2d 786, 796 (6th Cir. 1932), cert. den., 287 U.S. 611, 53 S.Ct. 14, 77 L.Ed. 531 (1932); Miles-Conley Co. v. Commissioner of Internal Revenue, 173 F.2d 958, 960 (4th Cir. 1949). Therefore, it is not inappropriate in the present instance that the plaintiff should be affected adversely by the lack of fully satisfactory evidence in the record relative to the matter of comparability.

■ Another pertinent factor—in view of the circumstance that Paul C. Jones was a major shareholder, the chairman of the board of directors, and the president and general manager of the plaintiff (a family owned corporation) during the years in issue—is a comparison between the amounts which he received as compensation and the amounts which he received as dividends, since in such a situation as the present one close scrutiny is warranted in order to ascertain whether the purported compensation actually constituted compensation for services rendered or was really to some extent a distribution of profits under the guise of compensation. Gem Jewelry Co. v. Commissioner of Internal Revenue, 165 F.2d 991, 992 (5th Cir. 1948), cert. den., 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770 (1948); Ecco High Frequency Corp. v. Commissioner of Inter-

nal Revenue, 167 F.2d 583, 585 (2nd Cir. 1948), cert. den., 335 U.S. 825, 69 S.Ct. 49, 93 L.Ed. 379 (1948); Northlich, Stolley, Inc. v. United States, 368 F.2d 272, 277–278, 177 Ct.Cl. 435, 442–443 (1966).

It has previously been noted that Paul C. Jones paid himself (in effect) as compensation the sums of $68,778.03, $58,627.08, and $48,370.93 for the fiscal years 1959, 1960, and 1961, respectively. For the same fiscal years, he distributed to himself (in effect) as dividends only $444.80 per year. This justifies an inference that some of the purported compensation really represented a distribution of profits. On the other hand, it must be mentioned in this connection that although Paul C. Jones and his sisters, Miss Ora E. Jones and Mrs. Gladys J. Chappell, each owned the same amount of stock in the plaintiff (i. e., 44½ shares), the amounts which they paid themselves as compensation varied widely. For example, in the fiscal year 1959, Paul C. Jones' compensation amounted to $68,778.03, Miss Ora E. Jones' compensation amounted to $36,941.81, and Mrs. Gladys J. Chappell's compensation amounted to $21,986.21. There were similar variations with respect to the fiscal years 1960 and 1961.

■ The qualifications of a person whose purported compensation is under consideration, the nature of the services performed, and the responsibilities involved should also be taken into account in determining the reasonableness of compensation. Mayson Mfg. Co. v. Commissioner of Internal Revenue, 178 F.2d 115, 119 (6th Cir. 1949); Patton v. Commissioner of Internal Revenue, supra, 168 F.2d at page 31. In this connection, it has been brought out previously that during the years in issue, Paul C. Jones served as chairman of the plaintiff's board of directors and that he also served as the plaintiff's president and general manager. He carried the overall responsibility for the plaintiff's operations. In addition, he fulfilled certain more specific executive functions, such as: personnel director; purchaser of flour,

bakery equipment, and rolling equipment; bakery engineer (although he is not an engineer by formal education); chief of marketing and sales, manufacturing, and industrial relations; advertising executive; and chief training executive. He was exceedingly well informed about the baking business, and he provided for the plaintiff a leadership that was aggressive, creative, hard-working, competent, and dedicated. Under his leadership and guidance, the plaintiff was kept in the forefront of every major development in the baking industry. By virtue of this, Paul C. Jones was entitled to receive ample compensation for his valuable services.

■ On the basis of the whole record, it appears that the amounts which the plaintiff paid to Paul C. Jones as purported compensation for the fiscal years 1959, 1960, and 1961 were, to some extent, unreasonably high, but that the amounts which the Internal Revenue Service determined to be reasonable were too low. It is extremely difficult to determine just what amounts represented reasonable compensation for those years. However, there is some comfort in the realization that the trier of this factual issue is not required to fix the amount of reasonable compensation for any year with mathematical precision. H. Levine & Bros. v. Commissioner of Internal Revenue, 101 F.2d 391, 393 (7th Cir. 1939).

■ After considering all the pertinent facts in the record, it appears—and it is so found—that of the respective amounts which the plaintiff paid to Paul C. Jones as purported compensation for the fiscal years 1959, 1960, and 1961, the sum of $45,000 each year—and only that figure—represented reasonable compensation for services rendered.

The evidence indicates that Paul C. Jones, Miss Ora E. Jones, and Mrs. Gladys J. Chappell, as the plaintiff's board of directors, seemingly regarded Miss Ora E. Jones' services as being approximately 56 percent as valuable to the plaintiff as the services of Paul C. Jones, and that they regarded the services of Mrs. Gladys J. Chappell as being approximately 33 percent as valuable to the plaintiff as the services of Paul C. Jones. This evaluation seems generally compatible with the evidence in the record. Consequently, it is concluded that of the amounts which the plaintiff paid to Miss Ora E. Jones as purported compensation for the fiscal years 1959, 1960, and 1961, the sum of $25,200—and only that figure—represented reasonable compensation each year for services rendered; and it is further concluded that of the amounts which the plaintiff paid to Mrs. Gladys J. Chappell as purported compensation for the fiscal years 1959, 1960, and 1961, the sum of $14,850—and only that figure—represented reasonable compensation each year for services rendered.

Accordingly, the plaintiff is entitled to a partial recovery on the issue of officers' compensation for each of the fiscal years 1959, 1960, and 1961.

### Depreciation on Delivery Equipment

The plaintiff uses light delivery trucks and heavy tractor-trailers in its business. The light delivery trucks—none of which has a gross weight of more than 9,000 pounds and the vast majority of which have gross weights of less than 9,000 pounds—are used by the plaintiff's route salesmen in delivering the plaintiff's products from the Greensboro bakery, or from the several relay distribution points, to retail outlets on the various routes established and maintained by the plaintiff. The heavy tractor-trailers are used by the plaintiff to transport its products from the Greensboro bakery to the several relay distribution points.

Up to and through the period 1959–1961, the plaintiff computed depreciation on its original-use delivery equipment under the "declining balance method," and assigned a useful life of 5 years to each piece of such equipment. Upon auditing the plaintiff's income tax returns for the fiscal years 1959, 1960, and 1961, the Internal Revenue Service determined that the plaintiff's original-use delivery equipment had a useful life

of 8 years, instead of 5 years, and recomputed the amount of allowable depreciation on this basis. In the recomputation, the Internal Revenue Service utilized a rate under the "declining balance method" of depreciation as though the useful-life period of 8 years, as determined by the IRS, had been originally estimated by the plaintiff.

On the basis outlined in the preceding paragraph, the Internal Revenue Service disallowed depreciation on delivery equipment previously claimed by the plaintiff to the extent of $11,108.53 for 1959, $11,272.23 for 1960, and $4,690.62 for 1961.

■ It is necessary to consider, first, the matter of the useful life of the plaintiff's delivery equipment.

The plaintiff had on hand 72 light delivery vehicles and 7 heavy tractor-trailers during the fiscal year 1959, it had on hand 92 light delivery vehicles and 8 heavy tractor-trailers during the fiscal year 1960, and it had on hand 90 light delivery vehicles and 8 heavy tractor-trailers during the fiscal year 1961.

During the fiscal years 1959, 1960, and 1961, the plaintiff had 51, 61, and 57 routes, respectively, on which its light delivery vehicles were driven—on the average—471, 461 and 480 miles per week during the respective fiscal years. Depending on the routes over which these vehicles were operated, they covered a mileage annually that ranged between 16,000 and 40,000 miles. The heavy tractor-trailers made longer runs than the light delivery vehicles, and it was not unusual for them to cover an annual mileage of from 40,000 to 60,000 miles.

It is essential to the plaintiff's survival that its light delivery vehicles be capable of serving each customer on a precise schedule, since many customers have assigned specific times to bakeries, including the plaintiff, for deliveries. If the plaintiff misses its assigned time at a particular retail outlet, it is not allowed to service the outlet on that day,

and it may lose the customer permanently.

The plaintiff's management, at the time involved in this litigation, displayed its customary efficiency and effectiveness in providing for the maintenance and repair of its delivery equipment on a basis that would enable such equipment to meet the demands upon it. The plaintiff had an experienced crew of mechanics, who maintained the operating efficiency of its vehicles. The mechanics changed the oil in the trucks when needed, they lubricated each truck every other week, and they performed such other preventive maintenance procedures as were required. In addition, the plaintiff had parts available, so that the mechanics could promptly make all the necessary repairs on its trucks.

Each salesman, when he returned to the bakery from his route, reported to the mechanics any trouble that he was having with his truck. The mechanics usually had the truck repaired and available for the salesman's use by the next morning. If the truck was not repaired by the next morning, or if a major repair (such as an engine overhaul) was needed, the salesman would be given one of the extra trucks on hand for his use until the mechanics completed the repairs.

The evidence in the record indicates that the plaintiff, after purchasing new delivery equipment, customarily retains and uses such equipment for at least 8 years.

Indeed, it is not unusual for the plaintiff to use its light delivery trucks for 10 years. When these trucks are no longer useful in its business, the plaintiff will sometimes retain a few such trucks (without obtaining licenses for them) in order to "cannibalize" them for parts. The plaintiff disposes of the other light delivery trucks that are no longer useful in its business by selling them for prices that range between $50 and $250.

Since the plaintiff's actual experience with its delivery equipment demonstrat-

ed that such equipment could be—and that it actually was—usefully employed in the plaintiff's business for 8 years or longer, the Internal Revenue Service did not commit any error in determining that a useful-life period of 8 years, rather than 5 years, should be used in computing the allowable depreciation on the plaintiff's delivery equipment for income tax purposes.[2]

■ The plaintiff argues that even if the Internal Revenue Service did not commit any error with respect to the adoption of the useful-life period of 8 years, the IRS nevertheless erred in recomputing the allowable depreciation for the 1959–1961 fiscal years as though the useful-life period of 8 years had been originally estimated by the plaintiff. The action of the IRS concerning this aspect of the depreciation controversy was taken in accordance with a regulation (26 C.F.R. § 1.167(b)–2) which provides in part as follows:

> (c) *Change in estimated useful life.* In the declining balance method when a change is justified in the useful life estimated for an account, subsequent computations shall be made as though the revised useful life had been originally estimated. For example, assume that an account has an estimated useful life of ten years and that a declining balance rate of 20 percent is applicable. If, at the end of the sixth year, it is determined that the remaining useful life of the account is six years, computations shall be made as though the estimated useful life was originally determined as twelve years. Accordingly, the applicable depreciation rate will be 16⅔ percent. This rate is thereafter applied to the unrecovered cost or other basis.

The plaintiff says, however, that this regulation is unreasonable and invalid because it treats a "declining balance method" taxpayer (such as the plaintiff) unfairly in relation to the treatment which is accorded a "straight line method" taxpayer or a "sum of the years-digits method" taxpayer in a situation where the Internal Revenue Service determines that, for purposes of depreciation, the useful-life period of an asset should be extended beyond the number of years claimed by a taxpayer.

Under the "straight line method" of computing depreciation, the estimated salvage value of an asset at the end of its estimated useful life is subtracted from the cost (or other basis) of the property, and the remainder is deductible in equal annual amounts over the period of the estimated useful life of the asset. If it is determined by the Internal Revenue Service, prior to the end of the period claimed by the taxpayer as the useful life of the asset, that the useful life of the property should be extended, the cost of the property, less its estimated salvage value and less the depreciation previously allowed (or allowable), is divided equally over the remaining years of the useful life of the property, as extended by the IRS. Thus, the administrative action in extending the useful life of the property does not affect the total amount of depreciation that is allowable to the taxpayer over the useful life of the property.

Under the "sum of the years-digits method" of computing depreciation, the allowable depreciation is computed by applying changing fractions to the cost (or other basis) of the property, less the estimated salvage value of the asset at the end of its estimated useful life. The fractions to be used in this computation are derived in the following manner: by adding the numbers representing the years of the useful life of the asset (e.

---

2. The Internal Revenue Service also determined that a useful-life period of 6 years —instead of 4 years, as claimed by the plaintiff—should be used under the "straight line method" in computing the depreciation on three second-hand tractor-trailers owned by the plaintiff. In the absence of evidence showing the actual useful life of these tractor-trailers, the determination of the IRS must be accepted as being presumptively correct. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

g., if the useful life of the asset is 5 years, the numbers to be added would be 1 plus 2 plus 3 plus 4 plus 5, and they would total 15); by using the sum thus obtained (e. g., 15) as a denominator; by using as the numerators of the fractions the same numbers taken in inverse order for each succeeding year of useful life; and by multiplying the total allowable depreciation (i. e., costs less salvage value) by such fractions in order to compute the amounts of depreciation allowable for the several years during the useful life of the asset. Thus, in the case of an asset having a useful life of 5 years, $5/15$ths of the total allowable depreciation (i. e., cost less salvage value) would be deductible in the first year, $4/15$ths would be deductible in the second year, etc.

In the case of a "sum of the years-digits method" taxpayer, if it is determined by the Internal Revenue Service, prior to the end of the period claimed by the taxpayer as the useful life of an asset, that the useful life of the property should be extended, the subsequent computations respecting depreciation are made as though the remaining useful life at the beginning of the taxable year of change were the useful life of a new asset acquired at such time, and with a basis equal to the unrecovered cost of the asset at that time. Here, again, the action of the IRS in extending the useful life of an asset does not affect the total amount of depreciation that is allowable to the taxpayer over the useful life of the property.

Under the "declining balance method" of computing depreciation, there is no subtraction of an estimated salvage value from the cost (or other basis) of an asset. The useful life of the property is estimated, and a uniform rate (which cannot exceed twice the appropriate "straight line" rate computed without adjustment for salvage) is applied each year to the unrecovered cost of the property. In the case of an asset with a useful life of 5 years, for example, the taxpayer can deduct for depreciation in the first year 40 percent of the cost of the property; he can deduct for the second year 40 percent of what remains after subtracting the allowable depreciation for the first year from the cost of the property; he can deduct for the third year 40 percent of what remains after subtracting the allowable depreciation for the first and second years from the cost of the property; and so on. The unrecovered cost at the end of the useful life of the property is presumed to be the salvage value of the asset.

It has been previously noted that when, prior to the end of the period claimed by a "declining balance method" taxpayer as the useful life of an asset, the Internal Revenue .Service determines that the useful life of the property should· be extended, the pertinent regulation provides that subsequent computations shall be made as though the revised useful life had been originally estimated by the taxpayer. With respect to the example used in the preceding paragraph, if the Internal Revenue Service determines that a useful-life period of 8 years—rather than 5 years, as claimed by the taxpayer—should be used in computing the depreciation on an asset, the maximum rate that can be used in computing depreciation over the remaining useful life of the asset, as extended by the IRS, is 25 percent, instead of the 40-percent rate originally used by the taxpayer. In this respect, the plaintiff points out that a "declining balance method" taxpayer is in a less favorable position than a "straight line method" taxpayer or a "sum of the years-digits method" taxpayer when the useful life of an asset, as originally estimated by the taxpayer, is extended by the Internal Revenue Service.

However, a taxpayer has freedom of choice in determining whether he will utilize the "declining balance method" or the "straight line method" or the "sum of the years-digits method" in computing the depreciation on assets used in the taxpayer's business. For a particular taxpayer—or perhaps for tax-

payers in general—each method may have some advantages and some disadvantages in relation to the other methods. For example, the comparatively large amounts that are deductible as depreciation during the earlier years of the useful life of an asset under the "declining balance method" undoubtedly appeal to many taxpayers as being very advantageous. Consequently, the circumstance that the "declining balance method" may be less favorable to a taxpayer than other methods in certain situations—such as, for example, if the Internal Revenue Service, prior to the end of the period claimed by the taxpayer as the useful life of an asset, determines that the useful life should be extended—does not make this aspect of the "declining balance method" unreasonable or invalid. It is merely a factor that should be weighed by a taxpayer in deciding whether he will adopt the "declining balance method" in preference to the other methods of computing depreciation. Moreover, a taxpayer should select a useful-life period in relation to the taxpayer's actual experience in using depreciable assets, thus avoiding corrective administrative action.

It must be concluded, therefore, that the plaintiff in the present case has failed to establish a right to recover on the depreciation issue.

### Demolition of Building

 In its Federal income tax return for the fiscal year 1961, the plaintiff claimed a demolition loss in the amount of $3,333.28 on account of the demolition of a building located at 715 South Elm Street in Greensboro. Upon auditing the plaintiff's return for 1961, the Internal Revenue Service disallowed a portion of this deduction to the extent of $1,530.87, on the ground that the basis claimed by the plaintiff for the building at the time of the demolition was incorrect.

At all times material to this litigation, the plaintiff's bakery was located at 104–108 East Lee Street, in Greens-

boro. Its East Lee Street property was bordered on the west by South Elm Street.

In 1947, the plaintiff purchased the lot known as 719 South Elm Street, which forms the rear boundary of the plaintiff's bakery and which, after its purchase by the plaintiff, was used as a driveway for the plaintiff's trucks into the bakery.

In August 1957, the plaintiff purchased the improved real property known as 715 South Elm Street for a total consideration of $7,500. This property consisted of a lot 59 feet wide and 100 feet deep, together with a house on the lot. The lot abutted the southwest corner of the plaintiff's bakery, and it also abutted the plaintiff's driveway at 719 South Elm Street.

The house on the lot at 715 South Elm Street was a frame house, with brick underpinning. It was about 50 years old in 1957, but it had been well maintained. The house was not insulated and it did not have adequate heating facilities, although it did have a fireplace, with lintels and a chimney.

At the time when the plaintiff purchased the property at 715 South Elm Street, the plaintiff's board of directors allocated $2,500 of the purchase price to the land and $5,000 to the house.

The property at 715 South Elm Street was purchased by the plaintiff primarily in order to expand its storage facilities. The house on the lot was used by the plaintiff from August 1957 until December 1960 for the storage of flammable materials, bread pans, brooms, janitorial supplies, and insecticides.

The house at 715 South Elm Street was demolished in December 1960, primarily to make room for a garage and off-street parking. As previously stated in this opinion, the plaintiff claimed for the fiscal year 1961 a demolition loss in the amount of $3,333.28 on account of this demolition; and the Internal Revenue Service disallowed the deduction to the extent of $1,530.87, on the ground that the basis claimed by the plaintiff

for the building at the time of the demolition was incorrect.

■ Unfortunately, the record does not contain adequate evidence on which a finding can be made concerning the value of the building at 715 South Elm Street, either at the time of the purchase of the house and lot by the plaintiff in August 1957 or at the time of the demolition of the building in December 1960. Accordingly, the value determined by the Internal Revenue Service is controlling, since the administrative determination is presumptively correct. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

■ Since a taxpayer suing for a tax refund has the burden of presenting to the court facts sufficient to prove a right to recover (United States v. Anderson, 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Meyers v. United States, 134 F.Supp. 520, 522, 133 Ct.Cl. 123, 127 (1955)), and since the plaintiff in the present case has not met this burden with respect to the demolition issue, it necessarily follows that the plaintiff has not established its right to recover on this issue.

### Conclusion

For the reasons stated in the preceding parts of this opinion, the plaintiff is entitled to recover on the claim relating to officers' compensation, and is not entitled to recover on the other claims set out in the petition. The amount of the partial recovery can be determined in subsequent proceedings under Rule 47 (c).

NICHOLS, Judge (concurring in part, dissenting in part):

I agree that the Commissioner of Internal Revenue could have disallowed a part of plaintiff's executive compensation. I differ both with him and with the court as to how the disallowance should be computed.

There is nothing illegal or immoral *per se* in a closely held corporation compensating its officers in part by a percentage of net profits, even when they are also stockholders. Should a reasonable plan be adopted prospectively and on a permanent basis, the tax laws would allow it considerable effect even during years when unusual prosperity might occasion executive compensation entirely out of line with that normal in similar companies paying a flat salary only. Should the additional compensation or bonus for a fiscal year be voted only after the year was closed and the results known, the permissible leeway would be a great deal less. When, as here, a plan for each year was adopted after that year has begun but before its close, there is an intermediate situation. But in none of these cases do the Tax Commissioner, our commissioner, or we judges, have any right to substitute our judgment for that of management as to whether officers should receive precentage or incentive compensation or be on a flat salary.

I think, since plaintiff was not committed to the plan for any year until voting it after the start of that year, its directors could not assume the plan was permanent, as plaintiff's brief asserts, but should have reconsidered it each year in light of the situation then existing. Had they done this, they would have seen that the assignment of 20% of the net profits before income taxes to Paul C. Jones, 12% to Ora E. Jones, and 8% to Gladys J. Chappell, 40% in all, however reasonable at the outset, had become less and less so as time went on. As a company grows by plowing back its earnings, instead of paying them out in dividends, the relative contributions of capital, and management undergo a change. In general, as net worth, capital, sales, assets, and plant, all grow, the contribution of management also grows, but at a lesser rate, and stated as a percentage of other indicators it declines. Therefore, if 20% was reasonable for Mr. Jones in 1955, some lesser percentage or percentages would be reasonable in 1959-60-61. How much lesser, I need not, as a minority of one, pause to determine. The

proper sequence of steps would have been to find what percentage or percentages would have been reasonable, prospectively applied in each year, and to compute the disallowances from them.

As a protection to the Federal Revenue, I do not know whether my technique or the court's is more effective, but I am sure that mine allows the directors of small companies a smidgen more of freedom to make their own decisions, free of second guessing by the superior wisdom of Washington.

If, however, it is proper to do as the court does, determining an allowable fixed salary for each year, regardless of operating results, I think the court should not have altered the figures recommended by our commissioner. These were: $40,000 for Paul C. Jones, $22,400 for Ora E. Jones, and $13,200 for Gladys J. Chappell. They are fact findings. Newport News Shipbuilding and Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967). Thus by Rule 66 they are presumed correct. I do not see how or where the presumption has been overcome.

COLLINS, Judge, joins in the foregoing opinion concurring in part and dissenting in part.