GARY N. CROMER and RUBY J. CROMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cromer v. Commissioner
Docket No. 2087-79.
United States Tax Court
T.C. Memo 1980-263; 1980 Tax Ct. Memo LEXIS 323; 40 T.C.M. (CCH) 701; T.C.M. (RIA) 80263; July 21, 1980, Filed *323 Held: Based upon all the facts presented, Compensation paid by petitioner's wholly owned corporation to petitioner was unreasonable. Held further: Reasonable compensation determined. Murray F. Hardesty and Thomas F. Puckett, for the petitioners. Patrick J. Dowling, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: [1] Respondent, on November 27, 1978, issued a statutory notice in which he determined deficiencies in income taxes due from petitioners as follows: Year
Amount
1973
$10,962.78
1975
48,833.27
1976
47,882.56
On November 26, 1979 the Court granted respondent leave to file an amended answer for the purpose of claiming increased *325 deficiencies in income tax as a result of the omission of interest income from petitioners' tax returns for the years 1973, 1975 and 1976. After concessions by both parties with respect to the amended answer the only issue remaining is whether the compensation paid to petitioner Gary N. Cromer by his wholly owned corporation was unreasonable and excessive. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Gary N. Cromer and Ruby J. Cromer, husband and wife, had as their principal place of residence, at the time of filing their petition herein, Manhattan, Kansas. They timely filed joint Federal income tax returns for the taxable years 1973, 1974, 1975 and 1976 with the Internal Revenue Service Center in Austin, Texas. During the taxable years 1973 to 1976, inclusive, petitioner Gary N. Cromer (petitioner) was the president and sole shareholder of Capitol Air Service, Inc. (hereinafter Capitol), which was incorporated on August 14, 1963 under the laws of the State of Kansas with its principal office in Manhattan, Kansas. Capitol's *326 principal business was that of a commuter air carrier among the cities of Manhattan, Kansas; Topeka Kansas; and Kansas City, Missouri; it also operated charter services, a flight training school, a Hertz auto rental service and a fixed base operation which included gasoline and maintenance service. Capitol's income is determined on the basis of a fiscal year ending June 30. For its fiscal year ended June 30, 1973, 1974, 1975 and 1976, Capitol had in effect an election under section 1372(a) to be taxed under the provisions of Subchapter S of the Internal Revenue Code. Petitioner first became associated with Capital in 1958 as a pilot, performing services as a flight instructor and charter pilot. Approximately November of 1969, petitioner became the sole shareholder of Capitol by purchasing the Capitol stock held by the estate of Nick Dellere. From November of 1969 to the present, petitioner has acted as the president of Capitol and has performed a variety of services, including piloting aircraft, dispatching and flight instruction. Petitioner performed approximately one-third of the dispatching duties at Capitol, which consisted of scheduling flights, aircraft and pilots. *327 The other dispatching was done under the guidelines set out by petitioner. The basic consideration in determining whether to make a flight was efficiency, and the use of the smallest airplane possible was always the rule. Close supervision by petitioner over the dispatchers and the pilots was necessary in order to avoid the use of larger aircraft, which were more desirable to fly but more expensive to operate. For its fiscal year ended June 30, 1970, Capitol's gross receipts were $527,947 and its net income after officer's salary was $85,000. Capitol paid compensation to petitioner during that fiscal year in the total amount of $50,300. On September 10, 1970, Capitol declared a dividend to petitioner in the total amount of $91,000. From that date to the present no further dividends have been declared or paid by Capitol. For its fiscal year ended June 30, 1971, Capitol's gross receipts were $562,258 and its net income after officer's salary was $148.21. Capitol paid compensation to petitioner during that fiscal year in the total amount of $103,800. On or about July 1, 1971 an employment contract was entered into between petitioner and Capitol. In addition to setting *328 out numerous other employment matters, the contract arrangement established the compensation to be paid petitioner for services rendered to the corporation. The compensation for services was the sum of $103,800 annually, plus additional compensation by way of a bonus which was to be paid during the fiscal year or within two and a half months thereafter as the employer determined in accordance with the formula set forth in the agreement. The bonus was to be calculated under the formula contracted for and agreed upon by the parties as follows: a. To the extent annual gross receipts (as reported on the Employer's Federal Income Tax Return) are greater than $234,400.00 but less than $834,401.00, Employee shall be paid thirty percent (30%) of such receipts annually. b. To the extent annual gross receipts are greater than $834,400.00 but less than $1,034,401.00, Employee shall be paid thirty-three (33%) of such receipts annually. c. To the extent annual gross receipts are greater than $1,034,400.00, Employee shall be paid forty-five (45%) of such receipts annually. The stated reason for basing petitioner's salary on the corporation's income was to provide an incentive to petitioner *329 to increase Capitol's share of the market. The contractual arrangement was ratified by the board of directors of Capitol as reflected in the minutes dated August 13, 1971. On that latter date, petitioner was the president and chairman of the board of directors of Capitol. Mrs. Cromer, petitioner's wife, was the secretary and treasurer of Capitol. Thus, Capitol's board of directors consisted of petitioner, Mrs. Cromer and Roger Sink, a certified public accountant. The compensation formula was not devised by petitioner, but was conceived by petitioner's tax attorney and CPA.
For Capitol's fiscal years ended June 30, 1971 to June 30, 1976, inclusive, the following table shows: (1) the amounts of Capitol's gross receipts, (2) Capitol's income before petitioner's compensation, (3) petitioner's compensation, and (4) the percentage of petitioner's compensation to Capitol's income before compensation: 6-30-71
6-30-72
6-30-73
6-30-74
6-30-75
6-30-76
(1) $562,258
$767,724
$972,771
$1,242,345
$1,493,214
$1,680,791
(2) 103,948
264,478
329,560
443,258
412,906
397,401
(3) 103,800
263,800
329,300
442,900
412,000
396,800
(4) 99.8%
99.7%
99.9%
99.9%
99.8%
99.8%
*330 Two and a half months after the end of Capitol's June 30, 1975 fiscal year, Capitol paid $247,000 to petitioner in satisfaction of the salary accrued to him by Capitol for its fiscal year ended June 30, 1975. Also during August and September petitioner lent $255,000 to Capitol. Capitol's cash-on-hand on June 30, 1975 was $3,020.68. In September 1976 Capitol paid $151,200 to petitioner for salary accrued to him by Capitol for its fiscal year ended June 30, 1976. Also in September 1976 petitioner lent $150,000 to Capitol. Capitol's cash-on-hand on June 30, 1976 was $4,309.53. Capitol enjoyed substantial growth during the period 1971 through 1976 as evidenced by the number of passengers carried by it. For the period ended December 31, 1971 Capitol carried 18,509 passengers; for the period ended December 31, 1976 Capitol carried 57,989 passengers. Part of this increase was due to increasing daily flights from 4 in 1969 to 15 during the years in issue. However, other commuter services also enjoyed substantial growth during this period of time. For example, Scheduled Skyways, which is a commuter airline serving principally the cities of Fayetteville, Arkansas; Little Rock, *331 Arkansas; and Tulsa, Oklahoma, increased the number of passengers carried from 8,536 for the period ended December 31, 1972 to 63,465 for the period ended December 31, 1977. During the period from 1970 through 1978, the number of passengers carried by commuter airline carriers generally in the United States increased at an average annual rate of 11.3 percent. For the year ended December 31, 1977, the number of passengers carried by commuter airlines generally in the United States increased an average of 16.4 percent. Thus, during the years in issue the market for commuter airlines increased generally, in part because major certified carriers were decreasing their services to smaller communities, thereby allowing commuter operators to take over these markets. Also aiding in the growth and success of Capitol were the efforts and hard labor of petitioner. All financial transactions of Capitol were handled and managed by petitioner as the chief executive officer. Except for the direct supervision of the maintenance shop, petitioner maintained and supervised every facet of the operations of Capitol. His duties included, but were not limited to, the personal management of approximately *332 45 employees, the fixed base operation for the air terminal, the sales and services performed in the gassing of airplanes, the overall operation of the charter airline business, the primary functions of the commuter airline, performing one-third of the dispatching functions, handling the ticket and reservation counter services for the general public, maintenance of the Hertz automobile rental counter, overseeing the Kansas City counter whose operation provided flight service from Kansas City heading West and the operations involved in the shipment of cargo on the airplanes owned by Capitol. In addition to the aforementioned duties petitioner was on call 24 hours a day to insure the successful operation of Capitol. During the calendar years 1973, 1975 and 1976, petitioner received interest income from Capitol totaling $247.91, $1,107.12 and $8,307.83, respectively, which he did not report on his returns for these years. OPINION This case is another in the long line of reasonable compensation cases. However, it is unique in that the focus of the instant case is not the deductibility of the payments by the corporation but the character of the income to the petitioner; that is, *333 whether any part of the distribution represents dividends and not earned income. Because Capitol is a Subchapter S corporation and petitioner its sole shareholder, the income would be reported by petitioner either as salary or dividends under section 1373(b), I.R.C. 1954. However, this distinction between earned income and dividend income is not esoteric. Section 1348 limits the tax imposed on earned income within any one taxable year to a maximum rate of 50 percent. The section 1348(b)(1) definition of earned income, for the years in issue, included income within the meaning of section 911(b). Section 911(b) defined earned income as the following: (b) Definition of Earned Income.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a *334 reasonable allowance as compensation for the personal services actually rendered. * * * Thus the portion of the distribution received by petitioner from Capitol which is in excess of a reasonable compensation is not earned income. Accordingly, it is taxed as a distribution of cororate profits (i.e. dividends) and thus subject to a maximum tax rate of 70 percent instead of the 50 percent rate applicable to earned income. Compare sections 1(a) and 1348(a). Section 162(a)(1) provides that in computing its taxable income a corporation shall be allowed as a deduction all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a "reasonable allowance for salaries or other compensation for personal services actually rendered." The sole question presented for our determination is whether the amounts paid as compensation by Capitol to petitioner, its chief executive officer and sold shareholder, were reasonable under the terms of section *335 162(a)(1). We would of course agree that a sole shareholder/executive is entitled to be as well paid as a comparable executive of a publicly owned corporation. But this is not to say, where the controlling shareholder sets his own compensation as an executive, that the reasonableness of such compensation does not require a second look by reason of the obvious lack of arm's length bargaining. Miles-Conley Co., Inc. v. Commissioner, 173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948). Capitol compensated petitioner for his services in two ways. He was paid a fixed salary of $103,000 per annum during each of the years in issue. In addition he received bonus compensation in accordance with a formula which provided that petitioner was to receive: 30 percent of the gross receipts in excess of $234,400 but less than $834,401; 33 percent of gross receipts greater than $834,400 but less than $1,034,401; and 45 percent of gross receipts if greater than $1,034,400. In addition to the salary and bonus formula set out in the employment contract the board *336 of directors of Capitol had in its discretion the power to pay additional bonuses to petitioner. We note the different methods of compensation simply because we must consider them together in order to determine if the compensation as a whole is reasonable. Charles E. Smith & Sons Co. v. Commissioner, 184 F.2d 1011, 1014 (6th Cir. 1950), affg. sub. nom. Hall C. Smith, 11 T.C. 174 (1948). The burden of proving reasonableness is upon petitioner, Botany Worsted Mills c. United States, 278 U.S. 282 (1929), and the question is one of fact to be determined from all the facts and circumstances of the particular case. Boyle Fuel Co. v. Commissioner, 53 T.C. 162, 169 (1969). As stated in Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), the relevant facts and circumstances may be summarized as follows: Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid *337 with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. We begin by consideration of the employment contract. Generally compensation paid pursuant to a contingency contract, which resulted from arm's length bargaining, will be allowed as reasonable even though the amount paid under the contract may prove greater than the amount which would ordinarily be paid. Income Tax Regs. section 1.162-7(b)(2). In the instant case at the time the contract was created, petitioner was the president, chairman of the board of directors and sole shareholder of Capitol. The other board members were petitioner's wife and his CPA. This obvious unity of interests negates the possibility that the contract *338 was entered into as a result of arm's length bargaining. To the contrary the record indicates that no bargaining occurred and that the compensation arrangement was created by petitioner's attorney and his accountant. It can reasonably be assumed, from the manner in which the compensation formula was utilized, that it was in reality a tax device designed to distribute all Capitol's taxable income and was not designed as a determinate of reasonable compensation. Thus it was, for instance, that for its fiscal year ended June 30, 1975 Captiol's gross receipts were $1,409,214 and its income before officer's salary was $412,906. Under the compensation formula, petitioner's salary for that fiscal year computes to $552,816. However, only $412,000 or 99.8 percent of its income was paid to petitioner. A similar result would be reached if we apply the formula to the fiscal year ended June 30, 1976. Our findings of fact reveal that for 6 consecutive years Capitol paid petitioner as salary from 99.7 to 99.9 percent of its income before compensation while paying no dividends. We hold this finding to be virtually conclusive that the salary formula was drafted to drain off Capitol's income as *339 compensation. Nor do we believe that the bonus formula provided an incentive for petitioner to increase Capitol's business. In view of petitioner's 100 percent ownership of the stock we find that such incentive would have been of little value to him. City Chevrolet Co. v. Commissioner, 228 F.2d 894 (4th Cir. 1956), affg. a Memorandum Opinion of this Court. We note, independently, our concern over the failure of Capitol to pay dividends since 1970. As we stated in Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 607 (9th Cir. 1968), affg. a Memorandum Opinion of this Court "The failure of the taxpayer to pay any dividend while radically increasing the compensation of its sole shareholder is particularly significant * * * as is the lack of any showing by the taxpayer that the duties of Rogers had significantly changed from the fiscal year in which he was paid a total compensation of $29,000." We note that petitioner's compensation in 1970, the last year that dividends were paid, was approximately $50,000. During the years in issue that compensation ranges from $329,300 to $442,900. Where a corporation has a large capital investment, such *340 as the corporation here involved, the shareholders are entitled to a return on their contributions. We doubt seriously whether a salary agreement or employment contract such as the one before us would be permitted by completely independent shareholders. Respondent contends that the amount allowed in the statutory notice is a reasonable compensation. The following tabulation shows the amount claimed, the amount allowed by respondent, and the amount determined to be reasonable by respondent's compensation expert: Allowed by
Year Ended
Claimed
Allowed
Expert
6/30/73
$329,300.00
$50,000.00
$66,404.00
6/30/74
442,900.00
60,000.00
67,340.00
6/30/75
411,999.91
59,999.91
68,212.00
6/30/76
396,800.00
60,000.00
68,862.00
We do note that respondent's own expert does not agree with respondent's determination. Further there are some flaws in the expert's determination. The expert's evaluation does not take into consideration petitioner's wearing more than one employee that. It cannot be denied that petitioner is a man of superior drive. Besides being the chief executive officer he oversaw Capitol's finances, customer service, dispatching, *341 worked as a pilot, and handled whatever else needed to be done. Petitioner worked 7 days a week and made himself available 24 hours a day. In addition to the aforementioned duties petitioner deserves recognition for his contribution to the growth of Capitol. Capitol Airlines grew at a faster rate than most commuter airlines during the same period of time. After having thoroughly considered the evidence in the instant case in light of the factors as set forth by the decided case in the area, we conclude that during the years in question Capitol paid unreasonable and excessive compensation to petitioner. Part of the amounts received by him, in fact, represented the payment of dividends and accordingly is not earned income for the purpose of sections 911(b) and 1348. We recognize the value of petitioner's services to Capitol. We have noted that he made a substantial contribution to Capitol's success. For this reason, as well as for reasons stated in our findings of fact, we cannot accept undisturbed respondent's determination as to what constitutes reasonable compensation. We attempt the delineation of reasonable compensation secure in the knowledge that we are not bound *342 to fix the amount with mathematical precision. Jones Brothers Bakery, Inc. v. United States,188 Ct. Cl. 226, 411 F.2d 1282, 1294 (1969). Our wish is always that cases such at this be settled. However, we must resolve the matter mathematically. In its 1970 fiscal year Capitol had taxable income, before paying petitioner's salary, of $135,300 of which it paid $50,300 or 37 percent, to petitioner as compensation. Later in 1970 Capitol paid its only dividend to petitioner. The 1970 fiscal year was the last year petitioner was employed by Capitol before the employment contract took effect. We find a 37 percent pay-out, in the form of compensation, of taxable income, before the compensation is paid, reasonable. Using that percentage as a guide, but rounding the figures off, we find the following salaries to be reasonable and hence deductible under section 162(a)(1): Year
Amount
1973
$122,500
1974
165,000
1975
153,000
1976
147,500
Any amounts claimed in excess of the sums set forth above, we hold nondeductible as compensation. We realize that our finding with respect to the year 1974 only affects the treatment of the disallowed portion *343 on Capitol's books for future distribution purposes. We believe the figures set forth above to be generous and mean no inference with respect to subsequent years. Decision will be entered under Rule 155.
Footnotes
1. This case was tried before Judge William H. Quealy↩ who subsequently resigned from the Court. By Order dated May 15, 1980 the case was reassigned for disposition.